637 A.2d 486

**PRESBYTERIAN UNIVERSITY HOSPITAL**

v.

**Joyce WILSON, et al.**

**No. 632, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Feb. 24, 1994.

306

Larry A. Silverman (Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, and George M. Church, (Church & Houff, P.A., Baltimore, on the brief), for appellant.

Daniel F. Goldstein (Rachel A. Wohl, Brown, Goldstein & Levy, John S. Singleton and Gendler, Berg & Singleton, P.A., Baltimore, on the brief), for appellees.

Argued before WILNER, C.J., ALPERT, J., and JAMES S. GETTY, Judge (Retired), Specially Assigned.

ALPERT, Judge.

In this case of first impression, we are asked to decide whether a Maryland court has jurisdiction over a Pennsylvania hospital that provided services to a Maryland resident in Pennsylvania.

Hugh Wilson ("Mr. Wilson") needed a liver transplant. He was insured through his wife's policy with Chesapeake Health Plan, a health maintenance organization ("HMO"). When his ailment was discovered during a routine physical examination, he was referred to Dr. Martin B. Cooper, a specialist. Dr. Cooper concluded that Mr. Wilson needed a "prompt liver transplant." Mr. Wilson's health started deteriorating rapidly in the summer of 1985. Accordingly, Joyce Wilson ("appellee" or "Mrs. Wilson") contacted her HMO about obtaining a liver transplant for her husband. She was told the HMO did not cover such a procedure. Mrs. Wilson then contacted Maryland Medical Assistance ("MA") and was informed that MA would cover such a liver transplant upon qualifying. She was required as a first step to have Dr. Cooper call MA's authorizing doctor. Dr. Cooper, however, suggested to Mrs. Wilson

that he would ascertain whether coverage could be obtained through her HMO. On August 23, 1985, Dr. Cooper called Dr. Thomas Starzl, the head of the liver transplant division of Presbyterian University Hospital ("PUH"), a hospital located in Pittsburgh, regarding Mr. Wilson's condition. Dr. Starzl informed Dr. Cooper that he should have Mr. Wilson come to PUH for admission the following Monday (*i.e.*, August 26, 1985). According to Mrs. Wilson, Donna Rinaldo, a PUH social worker, called the Wilson family the same day. The Wilsons, however, were not at home. Mrs. Wilson returned that call and she, along with Ms. Rinaldo, made arrangements for the Wilson family to travel to Pittsburgh. Mr. Wilson arrived in Pittsburgh on Sunday, August 25, 1985.

Mr. Wilson was not admitted to PUH the following day because Mr. Berkowitz, a PUH credit administrator, told the admitting office that Mr. Wilson's operation was not covered. Because his health was deteriorating, Mr. Wilson was admitted to PUH's emergency room on August 28, 1985 and remained in the hospital until his demise on September 6, 1985. He never received a liver transplant.

Mrs. Wilson brought suit in the Circuit Court for Baltimore City, individually and on behalf of her two daughters, against PUH and others [1] alleging, *inter alia*, breach of contract, negligence, and misrepresentation. PUH filed a motion to dismiss for lack of personal jurisdiction. After limited discovery pertaining solely to the jurisdictional issue, Mrs. Wilson filed her opposition to the motion to dismiss, contending that PUH's contacts within Maryland supported jurisdiction. Following oral argument, the court denied the motion. The appellee settled with the five Maryland defendants. Subsequently, PUH filed cross-claims against the Maryland defendants and also filed several third-party claims.

---

1. The other parties include: (1) Chesapeake Health Plan, Inc.; (2) Homewood Hospital Center, Inc.; (3) Martin Cooper, M.D.; (4) Chesapeake Physicians Professional Association; and (5) Medical Enterprise Development Co., Inc. These entities, however, are not parties to this appeal because the claims against them were settled and dismissed on October 28, 1992.

PUH then requested, and was granted, leave to file a motion for summary judgment based on lack of personal jurisdiction. In support, PUH stated that:

1. It is a non-profit Pennsylvania corporation which provides health care services to patients in Pittsburgh, Pennsylvania.

2. It owns no property in Maryland, does not maintain any office or place of business in Maryland, has never been and is not currently licensed or authorized to do business in Maryland, and does not have any agents in Maryland for service of process.

3. It sells no products and provides no services in Maryland, has no telephone listings or bank accounts in Maryland, pays no taxes in Maryland, and derives no income from services provided in Maryland.

4. It has not and does not advertise its services in Maryland.

Appellee asserted jurisdiction on the ground that the hospital was registered as a Maryland Medical Assistance ("MA") provider and was designated as a Maryland Transplant Referral Center. She maintained that PUH solicited business in Maryland, not through advertising, but through a seven-year persistent course of conduct and that Mr. Wilson's injuries were directly related to PUH's contacts within Maryland. After a hearing, PUH's motion was denied.

PUH filed an interlocutory appeal which was dismissed for lack of final judgment. PUH stipulated to a voluntary dismissal, with prejudice, of its cross and third-party claims in exchange for the appellee's agreement to reduce any jury verdict rendered against PUH. Appellee's suit proceeded to trial before a Baltimore City jury presided over by Judge Thomas E. Noel. At the close of the evidence, PUH moved unsuccessfully for judgment due to lack of personal jurisdiction. The jury rendered a verdict against PUH and judgment was entered. This appeal followed. The appellant presents this issue for our consideration:

Did the trial court err in finding that the Maryland courts could exercise personal jurisdiction over a nonresident hospital (PUH) which provided services outside the forum to a Maryland resident?

We conclude that the court did not err and accordingly affirm.

## Motion to Dismiss

As a preliminary matter, we address appellee's motion to dismiss this appeal. The motion is based on the fact that, in its brief, appellant has complained only about the denial of its motion for summary judgment and has taken no account of the evidence presented at trial bearing on its contacts with Maryland or of the court's denial of its motion for judgment at the end of the trial. Appellee asserts that under the authority of *Metropolitan Mtge. Fund, Inc. v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980), we are prohibited from considering the correctness of a denial of summary judgment after final judgment is entered. Alternatively, appellee contends that under *Basiliko*, we must limit our review to a determination of whether the trial judge abused his discretion in denying the motion for summary judgment.

PUH contends that the denial of the motion for summary judgment is reviewable on appeal. Specifically, PUH states that Md. Rule 8–131(d) permits an appeal of an interlocutory order after a final judgment has been entered. PUH also asserts that *Basiliko* is inapposite because there the summary judgment motion addressed factual issues which, after denial of the motion, were submitted for the fact-finder's determination. In the instant case, however, the order denying summary judgment motion addressed a legal issue (*i.e.*, whether PUH could be subjected to the jurisdiction of Maryland courts).

## The Meaning of Basiliko

Essentially, *Basiliko* arose out of a garden-variety factual dispute. Metropolitan Mortgage Fund, Inc. alleged that the Basilikos breached certain guaranty agreements, which allegedly were signed as additional security for two notes and a

deed of trust. Upon being sued for the deficiency arising out of the foreclosure of the deed of trust, the Basilikos responded to Metropolitan's motion for summary judgment with an affidavit purporting "to allege the existence of a dispute with respect to relevant facts between the parties." But after some further skirmishing, Metropolitan's motions for summary judgment were denied by the trial court and, subsequent to that denial, the Basilikos filed a plea denying execution of a note payment agreement. At a non-jury trial, the trial judge found as a fact that the Basilikos had not signed the "note payment agreement" and entered judgment for costs in their favor. We affirmed that judgment on Metropolitan's appeal to this court. The Court of Appeals granted certiorari, "restricted, however, to determining the scope of appellate review of the denial of a summary judgment motion following the entry of a final judgment on the merits."

The late Judge J. Dudley Digges explained the purpose and limitations of summary judgment procedure:

It is essential to the entry of a summary judgment that there be no dispute as to any material fact. The procedure is not a substitute for a trial, but is merely a preview to determine whether there exists a factual controversy requiring a trial. *Impala Platinum v. Impala Sales,* 283 Md. 296, 326, 389 A.2d 887, 904–05 (1978); *White v. Friel,* 210 Md. [274,] 285–86, 123 A.2d [303,] 308 [ (1956) ]. Thus, while [former] Md. Rule 610 d 1 states that when a movant is entitled to judgment as a matter of law, the court should render judgment forthwith, this does not mean that entry of judgment may not be delayed until after a trial on the merits, should, in the court's mind, the promotion of justice require it. *See Dev. Sales Co. v. McWilliams,* 254 Md. 673, 677, 255 A.2d 1, 3–4 (1969); *Jacobson v. Julian,* 246 Md. 549, 553–54, 229 A.2d 108, 112 (1967). It is our view that an appellate court should be loath indeed to overturn, on a very narrow procedural ground, a final judgment on the merits entered in favor of the party resisting the summary judgment motion. This is aptly demonstrated by the present case where, after a full evidentiary hearing, the court deter-

mined that respondents' signatures to the guarantee agreements were not genuine. To turn the tables in this manner would be nothing short of substituting a known unjust result for a known just one.

*　*　*　*　*　*

Consequently, we now hold that a denial (as distinguished from a grant) of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that, on appeal, absent clear abuse (not present in this case), the manner in which this discretion is exercised will not be disturbed.[2]

*Basiliko*, 288 Md. at 28–29, 415 A.2d 582.

Thus, it is clear that the reach of *Basiliko* is limited; it was intended to apply to those cases in which there are factual controversies—in which the ultimate results would be determined by resolution of facts. Where the material facts are genuinely disputed, summary judgment must be denied; where they are not, the trial court in its discretion may still defer or deny a summary judgment motion. Where, however, a motion for summary judgment is based upon a pure issue of

---

**2.** In some jurisdictions denial of a motion for summary judgment is not reviewable at all. The wisdom of that rule was explained thusly:

> To deny review seems to be unjust. But to grant it ... would be unjust to the party that was victorious at trial, which won judgment after the evidence was more completely presented, where cross-examination played its part and where witnesses were seen and appraised.... The greater injustice would be to the party which would be deprived of the jury verdict. Otherwise, a decision based on less evidence would prevail over a verdict reached on more evidence and judgment would be taken away from the victor and given to the loser despite the victor having the greater weight of evidence. This would defeat the fundamental purpose of judicial inquiry.

*Evans v. Jenson*, 103 Idaho 937, 941, 655 P.2d 454, 458 (1982) (quoting *Home Indemnity Co. v. Reynolds & Col*, 38 Ill.App.2d 358, 366–68, 187 N.E.2d 274, 278 (1962).

law that could not properly be submitted to a trier of fact, as such, to resolve, the conclusion in *Basiliko* that the denial of summary judgment will not be reviewed on appeal is inapplicable. The trier of fact, whether it be a jury or a judge sitting in that capacity, could not determine the issue of personal jurisdiction, as raised in this case. Here, the motion for summary judgment is in reality nothing more than an extension of, or supplement to, the appellant's (mandatory) motion to dismiss for lack of personal jurisdiction filed in these proceedings pursuant to Md. Rule 2–322(a). The cases are legion where the issue of personal jurisdiction was reviewed by an appellate court as preserved by the filing in the lower court of a motion to dismiss for lack of personal jurisdiction.[3]

We have carefully reviewed every Court of Appeals decision citing *Basiliko* and observe that none of those cases[4] address a motion for summary judgment based upon an issue that may not be disposed of by the trier of the fact. Were we to follow the guidance offered by the appellee, the issue of personal jurisdiction could never be reviewed, merely because the party

---

**3.** *See, e.g., Hansford v. District of Columbia,* 329 Md. 112, 617 A.2d 1057 (1993); *Yangming Marine Transport Corp. v. Revon Products,* 311 Md. 496, 536 A.2d 633 (1986); *S.A.S. Personnel Consultants, Inc. v. Pat–Pan, Inc.,* 286 Md. 335, 407 A.2d 1139 (1979); *Mohamed v. Michael,* 279 Md. 653, 370 A.2d 551 (1977); *Geelhoed v. Jensen,* 277 Md. 220, 352 A.2d 818 (1976); *Fletcher v. Fletcher,* 95 Md.App. 114, 619 A.2d 561 (1993); *Jason Pharmaceuticals v. Jianas Bros.,* 94 Md.App. 425, 617 A.2d 1125 (1993); *Poole & Kent Co. v. Equilease Assoc.,* 71 Md.App. 9, 523 A.2d 1018 (1987); *Marriott Corp. v. Village Realty & Inv.,* 58 Md.App. 145, 472 A.2d 510 (1984); *McKown v. Criser's Sales and Service,* 48 Md.App. 739, 430 A.2d 91 (1981); *Springle v. Cottrell Engineering Corp.,* 40 Md.App. 267, 391 A.2d 456 (1978); *Zinz v. Evans & Mitchell Industries,* 22 Md.App. 126, 324 A.2d 140 (1974).

**4.** Those cases are *New Jersey v. Strazzella,* 331 Md. 270, 279, 627 A.2d 1055 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 739, 625 A.2d 1005 (1993); *Adams v. Manown,* 328 Md. 463, 472, 615 A.2d 611 (1992); *Orkin v. Holy Cross Hospital,* 318 Md. 429, 435, 569 A.2d 207 (1990); *Foy v. Prudential,* 316 Md. 418, 422, 559 A.2d 371 (1989); *Farmers & Mechanics Bank v. Walser,* 316 Md. 366, 388, 558 A.2d 1208 (1989); *Electro–Nucleonics v. W.S.S.C.,* 315 Md. 361, 366, 554 A.2d 804 (1989); *Geisz v. G.B.M.C.,* 313 Md. 301, 314, 545 A.2d 658 (1988); *Henley v. Prince George's County,* 305 Md. 320, 333, 503 A.2d 1333 (1986); and *Coffey v. Derby Steel,* 291 Md. 241, 247, 434 A.2d 564 (1980).

asserting that defense chose to seek finality via the route of summary judgment procedure. We shall not engage in such manifest injustice and, therefore, we deny appellee's motion to dismiss the appeal.

### Scope of Review

For purposes of this opinion, we limit the scope of review to the pleadings, supporting documents, and argument presented to the court in connection with the summary judgment motion. The factual conclusions set forth in the remainder of our opinion are from the record available to Judge Noel when he ruled on the motion for summary judgment.[5] Our standard of review is whether the trial court was legally correct. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990).

### 1. Personal Jurisdiction and Due Process

The propriety of determining whether a court can exercise personal jurisdiction over a nonresident defendant generally entails a two-step analysis. The first step involves an analysis under Maryland's long-arm statute. Md. Cts. & Jud. Pro.Code Ann. § 6–103 (1989 Repl. Vol.). The second step involves an analysis under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Mohamed v. Michael,* 279 Md. 653, 657, 370 A.2d 551 (1977); *Jason Pharmaceuticals v. Jianas Bros. Packaging Co.,* 94 Md.App. 425, 434, 617 A.2d 1125 (1993); *Bahn v. Chicago Motor Club Ins. Co.,* 98 Md.App. 559, 634 A.2d 63 (1993). PUH limits its appeal solely to "whether the exercise of jurisdiction over PUH violates the Due Process clause." Thus, our review is confined to that issue.

The Supreme Court has enunciated the limits of in personam jurisdiction under the Due Process Clause. *See e.g.,*

---

**5.** Even if PUH's motion for judgment, made after all the evidence had been presented, is preserved for our review, we conclude that our decision, upholding the court's exercise of jurisdiction, would not be affected for the reasons mentioned in the remainder of the opinion.

*Asahi Metal Indus. v. Superior Court of Cal.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion); *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These decisions establish that a defendant must have sufficient "minimum contacts" with the forum state so that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158; *Camelback Ski Corp. v. Behning*, 307 Md. 270, 513 A.2d 874 (1986), *vacated and remanded on other grounds*, 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *opinion on remand*, 312 Md. 330, 335, 539 A.2d 1107, *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988).

There are no set procedures for ascertaining whether "minimum contacts" exist; instead, a court is required to examine the facts of each case. *Kulko v. California Superior Ct.*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1696–97, 56 L.Ed.2d 132 (1978). A fundamental inquiry is whether the non-resident defendant engaged in some act or conduct through which the benefits and protection of the law of the forum state were "purposefully avail[ed]." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958). Thus, minimum contacts are established when an out-of-state defendant "purposefully direct[s]" its activities towards the resident of the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984)). Additionally, "[o]nce it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476, 105 S.Ct. at 2184.

Our inquiry, therefore, focuses on PUH's contacts within Maryland and examines the factors of "fair play and substantial justice." The relevant fairness factors are:

[1] the burden on the defendant; [2] the interests of the forum State; [3] the plaintiff's interest in obtaining relief; [4] the inter-state judicial system's interest in obtaining the most efficient resolution of controversy; and [5] the shared interest of the several states in furthering fundamental substantive social policies.

*Camelback Ski Corp. v. Behning,* 312 Md. 330, 342, 539 A.2d 1107 (1988) (*Camelback II*).[6] The Court of Appeals also stated that "[w]here the fairness factors of the second step militate strongly in favor of the exercise of jurisdiction, a lesser showing of minimum contacts than would otherwise be required might suffice." *Id.* at 341, 539 A.2d 1107.

## 2. Specific or General Jurisdiction

Appellee asserts that the trial court could have exercised either specific or general jurisdiction. This is so because PUH was designated as a national referral center for transplants in Maryland and Mr. Wilson's cause of action was directly related to PUH's contacts within Maryland. PUH contends that because the cause of action allegedly arose in Pennsylvania, general jurisdiction, rather than specific jurisdiction, must be established.

In *Camelback II,* the Court of Appeals stated that

the quality and quantity of contacts required to support the exercise of personal jurisdiction will depend upon the nature of the action brought and the nexus of the contacts to the subject matter of the action. [T]he spectrum of cases may be generally divided into those involving general jurisdiction (the cause of action is unrelated to the contacts), and those involving specific jurisdiction (the cause of action arises out

---

6. We note that these factors that were articulated by the Supreme Court in *Burger King,* 471 U.S. at 253, 105 S.Ct. at 1934, were applied by the plurality in *Asahi,* 480 U.S. at 115–16, 107 S.Ct. at 1033–34, and are discussed, *infra,* in section 5.

318

> of the conduct which constitutes the contacts). Generally speaking, when the cause of action does not arise out of, or is not directly related to, the conduct of the defendant within the forum, contacts reflecting continuous and systematic general business conduct will be required to sustain jurisdiction.

*Camelback II,* 312 Md. at 338, 539 A.2d 1107. The instant case, however, cannot be compartmentalized as either a general or specific jurisdiction case. The *Camelback II* Court noted that in cases where it is not clear whether general or specific jurisdiction is applicable "the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases." *Id.* at 339, 539 A.2d 1107. Certainly, Judge Noel was cognizant of this fact when he stated that "[t]his is one of those cases that's not a general jurisdiction fact situation nor is it a specific. It is somewhere in between."

### a. The PUH Position

PUH contends that the trial court erred in asserting jurisdiction over it because the instant case involves services provided to a Maryland resident outside the forum. PUH asserts that the distinction between services provided outside the forum and products which are placed into the 'stream of commerce' and cause injury inside the forum state is critical. PUH maintains that *Camelback II* is dispositive of the case sub judice because that case addressed whether a Maryland court could assert jurisdiction over a nonresident defendant who provides services outside the forum state. Specifically, PUH states that it is like the ski-resort in *Camelback II* and that "jurisdiction over PUH cannot be grounded upon evidence that PUH provided services in Pennsylvania to Maryland residents, even if a 'significant portion' of PUH's income were derived from Maryland residents, which is not the case here."

PUH recognizes that there are no Maryland cases addressing the application of *Camelback II* to a nonresident health care provider. PUH, however, submits that several cases from other jurisdictions have held that exercising personal jurisdiction over a nonresident health care provider violates due process. *Gelineau v. New York University Hospital,* 375 F.Supp. 661 (D.N.J.1974); *Good v. The Presbyterian Hospital in the City of New York,* Civil Action No. 92–4695, 1993 WL 131451, 1993 U.S. Dist. Lexis 5477 (E.D.Pa., April 27, 1993); *Wright v. Yackley,* 459 F.2d 287 (9th Cir.1972); *Kennedy v. Freeman,* 710 F.Supp. 1317 (N.D.Okla.1989); [7] *Nicholas v. Ashraf,* 655 F.Supp. 1418 (W.D.Pa.1987).

PUH asserts that the cases cited by the appellee are not applicable to the facts in the instant case. *See generally Kenerson v. Stevenson,* 604 F.Supp. 792 (D.Me.1985); *Cubbage v. Merchent,* 744 F.2d 665 (9th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985); *Lemke v. St. Margaret Hosp.,* 552 F.Supp. 833 (N.D.Ill.1982). Specifically, it explains that those cases are dependent upon the proximity of the nonresident hospitals, the presence of advertisements, solicitations by those hospitals in the forum, and the large number of forum residents who were treated at the nonresident hospitals. Thus, PUH argues that participation in a forum's Medicaid program and acceptance of Medicaid reimbursements, by itself, does not satisfy the minimum contacts standard.

PUH characterizes the registration and reimbursement process with the Department of Health and Mental Hygiene (DHMH) as mere "paperwork." Accordingly, it asserts that this "paperwork" was only submitted so that it could get paid when "it treated the rare Maryland patient who came to PUH and who was qualified to receive Maryland Medicaid." Moreover, it contends that it would be unfair to require it to defend lawsuits all over the country merely because the patient decided to return home and then initiate a lawsuit for services

---

7. This case was reversed by the Tenth Circuit. *See Kennedy v. Freeman,* 919 F.2d 126 (10th Cir.1990).

sought in another jurisdiction. PUH also urges that if such an action is allowed to proceed, it will have a "chilling effect" on the availability of professional services to nonresidents.

### b. The Wilson Position

Appellee contends that the trial court did not err because PUH's contacts with Maryland were systematic and continuous and the alleged cause of action arose from those contacts. In other words, jurisdiction can be asserted because PUH's actions fall within the continuum as described by the Court of Appeals in *Camelback II*. We agree.

### 3. The PUH Contacts

In *Camelback II*, the Court of Appeals held that a Maryland court did not have jurisdiction over a Pennsylvania ski resort operator because of insufficient contacts within the forum State. The Court recognized that the resort operator was a "fixed-site merchant who is simply aware that a portion of his income regularly is derived from the patronage of customers coming from other states." *Camelback II*, 312 Md. at 340, 539 A.2d 1107. The Court also noted the following facts:

> Camelback's involvement with Maryland is more than mere awareness that some part of its income is regularly derived from the patronage of citizens of this State. Camelback was aware that others, for their own economic purposes, were publicizing the Camelback resort ...; that Maryland residents could, and probably were, using a toll-free telephone number to obtain information concerning snow conditions at the resort ... that a small number of its brochures were occasionally requested by Maryland ski shops ... On the other hand, Camelback did not devote its energy or financial resources to the marketing of Maryland. It allocated no part of its advertising budget to Maryland, and following one very brief and unsuccessful attempt to solicit business in this State in 1982, it abandoned any attempt to include Maryland in its primary marketing area, or conduct any active solicitation here.

*Id.* at 341, 539 A.2d 1107. The Court then considered the fairness factors and concluded that the ski resort operator had not "purposeful[ly] avail[ed]" itself of the "benefits or laws of this State" to "satisfy the threshold test of minimum contacts mandated by the Due Process Clause." *Id.* at 342, 539 A.2d 1107.

In the instant case, PUH's contacts are significantly different than those of the ski resort operator in *Camelback II.* Our review of the record discloses that PUH's contacts with Maryland began as far back as November 1982 when it applied to the Maryland Department of Health & Mental Hygiene ("DHMH") as a provider of services to Maryland MA patients. At that time, DHMH did not actively solicit hospitals to become Maryland MA providers. On July 30, 1984, PUH was designated, in accordance with the Hospital Service Regulations section of the Code Of Maryland Regulations ("COMAR"), (regulations that govern certain activities of Maryland health care providers), as a national referral center for non-experimental organ transplants. COMAR 10.09.06.04A (effective date, October 15, 1984). As a prerequisite, PUH had to comply with several requirements including being certified as a Medicaid provider. The COMAR defined a provider as "a hospital which through appropriate agreement with the Department has been identified as a Program provider by the issuance of an individual account number." COMAR 10.09.06.01(X). Additionally, to be designated as a national referral center a hospital had to be certified as a provider and:

(a) Be a full service tertiary research and teaching facility;

(b) Have medical and clinical expertise in sub-specialties related to organ transplantations . . .;

(c) Be equipped with a tissue laboratory capable of tissue typing and immunological techniques;

(d) Be capable of supplying large quantities of blood on short notice;

(e) For liver transplantations, have performed at least 12 similar procedures in the preceding 12 months.

COMAR 10.09.06.04A(14). Thus, PUH had to comply with numerous requirements to be designated as a Maryland MA provider and as a national referral center.

We also note that PUH engaged in other communications with DHMH. Specifically, PUH sought to change the per diem rate it was receiving for Maryland patients from DHMH. PUH was designated in the COMAR as a heart/lung transplant referral center effective July 10, 1986. PUH also negotiated and executed a provider agreement with the DHMH.

PUH's own figures show that in fiscal year 1984–85 two patients received liver transplants, for which PUH received $105,428.00 from Maryland MA. In fiscal year 1986–87, PUH treated seventy-eight Maryland patients and received $2,264,-169.00 from Maryland. Similarly, in fiscal year 1987–88, PUH treated seventy-two Maryland patients and was reimbursed $2,333,114.00 from Maryland. PUH, however, dismisses these figures as insignificant because the Maryland MA receipts were less than one percent of the total revenue generated by the Hospital. This comparison is not conclusive, however, because it does not address PUH "contacts" within the State. As Judge Noel appropriately commented,

> [The court had] a real concern about how much weight [it] should attach to the income coming from the forum state, period. It's the—not necessarily the income that comes from the forum state that [the court is] concerned with, but the efforts the hospital itself initiates with the forum state.
>
> \* \* \* \* \* \*
>
> [What concerns the court is not] what revenue PUH may be obtaining because Maryland residents may avail themselves of the services there, but it's the efforts that PUH goes through to let everyone in the region know [it is] the only one[ ] that provide[s] this, and this is the only place you can get this service. . . .

We agree with the trial court's reasoning that in determining whether a court should exercise personal jurisdiction over a non-resident defendant, the inquiry should be directed towards determining the extent of the contacts within

the state, not the success thereof solely as it relates to the entire revenue picture. Millions of dollars of revenue are indeed not insignificant sums.

Appellee asserts that because PUH submitted the requisite "paperwork" to be reimbursed by Maryland MA and requested to be designated as a national referral center, PUH has purposefully directed its activities towards Maryland residents. The trial court questioned PUH's counsel below on this point. Specifically, the following colloquy transpired:

> The Court: There were ongoing relationships between Maryland and [PUH] for some years prior to this Wilson incident, and the negotiations for the Medicade [sic] coverage—there was an ongoing agreement, the fact that you have locked into the Medical Assistance system in Maryland, you would be bound by the regulations pertaining to that system in Maryland.
>
> * * * * * *
>
> The Court: What could be more of—what could be more in the context of an ongoing relationship than your hospital [PUH] having a contract with the forum state?
>
> * * * * * *
>
> The Court: Okay, but you have an ongoing contract with a party, that party being the State of Maryland, and assuming the facts regarding the incident occurred in Pennsylvania at the hospital because of the treatment of someone, maybe there was a question of what services were actually provided, and there was a dispute regarding that. Would Maryland have jurisdiction, even though all of the facts regarding the incident occurred in Pennsylvania?
>
> Mr. Silverman [PUH counsel]: If Maryland was suing under this contract, which I assume was executed in Maryland, or at least signed—sent on to Maryland, then yes.

Thus, PUH's representation that submitting the requisite forms to Maryland MA for reimbursement constituted mere "paperwork" is not accurate. In fact, the "paperwork" is indicative of an ongoing relationship between PUH and Mary-

land. In addition to the generalized contacts, we also note that Dr. Cooper conversed with Dr. Starzl regarding Mr. Wilson's condition and that Dr. Starzl told him to have Mr. Wilson come to PUH. Additionally, there is testimony, albeit somewhat conflicting, that Donna Rinaldo, a PUH social worker, called the Wilson household to arrange for the Wilsons' stay in Pittsburgh. The appellee's case below was predicated on these "contacts" because they allegedly established a duty on PUH's part to provide the necessary care and treatment for Mr. Wilson.

We conclude that the record before us demonstrates that PUH has engaged in a continuous relationship with Maryland since 1982. This relationship has a direct connection with appellee's case because Mr. Wilson's ailment was the type of infirmity that PUH's contacts with Maryland were designed to reach. In other words, even though Mr. Wilson was not finally approved as a Maryland MA recipient, having died before the process was completed, he needed a liver transplant, precisely the very service that PUH was designated for in the COMAR.

### 4. Other Cases

The cases cited by the appellant are also distinguishable from the case sub judice. In *Gelineau v. New York University Hospital*, 375 F.Supp. 661 (D.N.J.1974), the court addressed the question of whether a New Jersey resident who traveled to New York City for treatment on his local doctor's advice could sue the hospital in New Jersey. The court granted the hospital's motion to dismiss because:

When one seeks out services which are personal in nature, such as those rendered by ... hospitals or accountants, and travels to the locality where he knows the services will actually be rendered, he must realize that the services are not directed to impact on any particular place, but are directed to the needy person himself. While it is true that the nature of such services is that if they are negligently done, their consequences will thereafter be felt wherever the client or patient may go, *it would be fundamentally*

*unfair to permit a suit in whatever distant jurisdiction the patient may carry the consequences of his treatment....*

 ✳ ✳ ✳ ✳ ✳ ✳

[Finding jurisdiction] would have a chilling effect on the availability of professional services to non-residents.

*Id.* at 667 (emphasis added). PUH asserts that *Gelineau* is applicable to the instant case. Specifically, PUH contends that Mr. Wilson came to Pittsburgh at the behest of his local doctor (Dr. Cooper) and the alleged negligence occurred outside the forum State (*i.e.,* in Pittsburgh, Pa.).

PUH also cites *Good v. The Presbyterian Hosp. in the City of New York,* Civil Action No. 92–4695, 1993 WL 131451, 1993 U.S. Dist. Lexis 5477 (E.D.Pa. Apr. 26, 1993) for the proposition that where the plaintiff is injured outside the jurisdiction, personal jurisdiction can be maintained only where the defendant has maintained continuous and systematic contacts with the forum. *Good* and *Gelineau* are, however, inapposite on their facts. In those cases, the defendants did not have continuous and systematic contacts with the forum.

We believe that *Cubbage v. Merchent,* 744 F.2d 665 (9th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985), clearly illustrates why the cases cited by PUH are inapposite. In *Cubbage,* a patient brought suit in California against a hospital and doctors located in Parker, Arizona. The doctors lived in Arizona and the hospital was also located and licensed there. The district court dismissed the suit for lack of personal jurisdiction. On appeal, the Court of Appeals for the Ninth Circuit reversed, stating:

[The] doctors applied for and received Medi–Cal numbers from the State of California. A Medi–Cal number permits a health care provider to receive reimbursement from the state for services rendered to eligible California residents.

 ✳ ✳ ✳ ✳ ✳ ✳

[The court's] focus is on whether [the doctors] *purposefully* took some action by which they *invoked the protection of California law.* [The] doctors purposefully applied for a

Medi–Cal number. [The doctors] invoked the protection of California law by placing themselves within the statutory safeguards provided health care providers seeking to settle grievances or complaints regarding unpaid Medi–Cal fees.

*Id.* at 668 (emphasis in the original) (citations omitted).

The court went on to distinguish its earlier decision in *Wright*. The *Wright* court held that an Idaho court did not have jurisdiction over a South Dakota doctor who treated the patient in South Dakota and whose only contact with Idaho was when he mailed the patient a copy of the original prescription. *Wright*, 459 F.2d at 291. The *Wright* court had noted:

In the case of personal services focus must be on the place where the services are rendered, since this is the place of the ... patient's ... need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself.

*Id.* at 289. The *Cubbage* court declined to follow the *Wright* decision because each jurisdictional inquiry turns on the facts of each case. *Cubbage*, 744 F.2d at 669. The court went on to distinguish many of the cases relied upon by the appellant, including *Gelineau*, because in those cases "the patient undertook 'unilateral activity' in seeking medical treatment." *Id.* In sum, the *Cubbage* court essentially refuted the same argument that we are faced with.

In addition to *Cubbage*, we find the reasoning in *Kennedy v. Freeman*, 919 F.2d 126 (10th Cir.1990) persuasive.[8] In that case, the plaintiff-patient was an Oklahoma resident who sought medical advice from Dr. Freeman, a Texas resident. The plaintiff's doctor sent an unsolicited specimen slide to Dr. Freeman's laboratory for analysis. Dr. Freeman's analysis, according to the plaintiff, was incorrect and delayed her treatment by four years. The plaintiff brought an action in Oklahoma alleging negligent diagnosis and analysis. Dr.

---

8. In its brief, PUH cites only the lower court's opinion in this case.

Freeman filed a motion to dismiss for lack of personal jurisdiction that was granted by the trial court because neither Dr. Freeman nor his professional association had sufficient minimum contacts with Oklahoma. *Kennedy v. Freeman*, 710 F.Supp. 1317 (N.D.Okl.1989). The trial court reviewed many of the cases cited by PUH and concluded that:

> The report sent in the present case [by Dr. Freeman] was only incidental to the services rendered in Texas. Accepting an out-of-state patient is not doing business within the foreign state. The unilateral action of the Plaintiff in seeking and obtaining the services of the Texas Defendant cannot serve to satisfy jurisdictional requirements. The Court also finds that even if Defendants have accepted a significant number of slides from Oklahoma it would still not have personal jurisdiction over these Defendants ... Unless there is some form of solicitation from the nonresident defendant aimed at the forum, jurisdiction does not lie if all the services are rendered outside the forum state.

*Id.* at 1320 (citations omitted).

On appeal, the Court of Appeals for the Tenth Circuit reversed. The court reasoned:

> In the context of doctor-patient litigation, special rules have evolved to ensure that personal jurisdiction is asserted over a doctor only when she has purposefully availed herself of the privileges of conducting activities within her patient's state. While a doctor's practice may be local, she may often treat out-of-state patients who seek her help. Thus, courts have had to fashion jurisdictional rules when doctors who have essentially local practices become involved in another state not as a result of their intention to do so but, rather, as a result of the action of their out-of-state patients. Courts have found jurisdiction over nonresident doctors where they purposefully directed their actions at plaintiffs' states. For example, where doctors or hospitals have intentionally solicited business from a state, courts have held jurisdiction over them to be proper in that state.

> The district court here erred in asserting that jurisdiction over a nonresident doctor cannot be established '[u]nless there is some form of solicitation.' Whether a 'party solicited the business interface is irrelevant, so long as defendant then directed its activities to the forum resident.'

> \* \* \* \* \* \*

> We hold that Freeman's actions were sufficient to establish jurisdiction. While Freeman did not solicit Kennedy's business in Oklahoma, he did purposefully direct his actions there. He willingly accepted the sample from Oklahoma; he signed a report . . .; and he evidently sent his bill there.

*Kennedy,* 919 F.2d at 129 (citations omitted). Thus, the *Cubbage* and *Kennedy* court concluded that the forum state could exercise jurisdiction over a nonresident defendant even though the defendant in each case had considerably less contacts than PUH has with Maryland. *See* section 3, *supra* at 320–24; *see generally* Dave R. Bonelli, Annotation, *In Personam Jurisdiction, Under Long–Arm statute, Over Nonresident Physician, Dentist, or Hospital in Medical Malpractice Action,* 25 A.L.R.4th 706 (1983).[9]

In *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958), the Supreme Court noted that "[t]he unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." In other words, in determining whether jurisdiction exists, a court must examine the nonresident defendant's activities in that forum. Thus, for example, in *Gelineau,* the court did not find jurisdiction because, unlike the case sub judice, there was no showing that the New York hospital had any connections with New Jersey. As noted above, however, PUH did have continuous and

---

9. We also note that the Supreme Court has stated that with respect to interstate contractual obligations parties who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulations and sanctions in the other state for the consequences of their activities." *Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182 (citations omitted).

systematic contacts with Maryland and the appellee's actions were not unilateral.

We also note that the *Cubbage* court was not persuaded by the argument that subjecting the nonresident doctors and hospitals to suits in another forum would have a "chilling effect" on the availability of medical services. This was because there was no showing that the nonresident health care providers would not treat California patients for fear of being sued in that state. *Cubbage*, 744 F.2d at 669–70. We conclude similarly that the record before us does not demonstrate that the ability of Maryland residents to obtain medical services from non-resident health care providers will be curtailed in any manner.

We further conclude that the trial court could have found that PUH did undertake a "solicitation" by placing its name as a national referral center in the COMAR. In Maryland, the COMAR governs certain activities of health care providers. The COMAR specifies what is and is not allowed. Thus, by placing its name in COMAR as a national referral center, PUH reached what was, in effect, a captive audience. Whereas nine out of ten people may use the Yellow Pages, the COMAR is used by ten out of ten health care providers. It is the functional equivalent of, if not superior to, the Yellow Pages. In this respect, we find the appellee's position particularly compelling:

> This designation, published to hospital administrators and physicians, is also the logical advertising mode for PUH to use to seek out Maryland transplant referrals, generally. Unlike some elective procedures that patients arrange for themselves, liver transplant referrals are made by hospitals and physicians who are unable to perform the procedure.

Thus, we hold that PUH did establish sufficient "minimum contacts" with Maryland. *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158; *Camelback II*, 312 Md. at 330, 539 A.2d 1107.

### 5. The Fairness Factors

The *Camelback II* court listed the fairness factors as follows:

[1] the burden on the defendant; [2] the interests of the forum State; [3] the plaintiff's interest in obtaining relief; [4] the inter-state judicial system's interest in obtaining the most efficient resolution of controversy; and [5] the shared interest of the several states in furthering fundamental substantive social policies.

We now consider these factors.

### a. Burden on the defendant

While we do not minimize the inconvenience of distant litigation on any party, PUH's greater resources may lessen its burden in this regard.

### b. Interests of the forum State

In our discussion above, we have determined that PUH's contacts with Maryland are sufficient to establish minimum contacts. Presumably, PUH had registered with the DHMH to induce customers to use its services. The benefits thereby accruing to PUH are neither fortuitous nor incidental. Additionally, as conceded by PUH during oral argument on the motion for summary judgment, Maryland could have maintained an action against PUH for a possible breach of contract. Therefore, Maryland, as the forum state, obviously has an interest in protecting its citizens against the tortious conduct of nonresident defendants who accept the benefits of a foreign jurisdiction.

### c. Plaintiff's interest

Mr. Wilson and the appellee were residents of the forum State and five of the six defendants were also Maryland residents. PUH is the only nonresident defendant. Arguably, if this suit were filed in Pennsylvania, as proposed by PUH, appellee would have had a more onerous burden of establishing the Pennsylvania court's jurisdiction over the other nonresident (Maryland) defendants.

#### d. Inter-state judicial system's interest

Maintaining the suit in Maryland expedites the speedy resolution of this controversy because five of the six defendants are residents of this state.

#### e. Shared interest of several states

We also conclude that exercising jurisdiction over PUH will not have a "chilling effect" on the availability of medical services to Maryland residents and is not contrary to any social policies. *See Cubbage,* 744 F.2d at 669–70. In fact, we conclude that holding PUH accountable for its actions in Maryland actually benefits the citizens of this state. This is because, unlike *Asahi,* where the Supreme Court concluded that California's interest, as the forum State, was slight, *Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033, Maryland, in the case sub judice, has a significant interest because the appellee along with five out of the six initial defendants were Maryland residents. In *Asahi,* eight justices agreed that even if the first step of establishing minimum contacts was satisfied, under the second step, it would be unreasonable for California to assert jurisdiction over two nonresident corporations. Therefore, the Court noted that:

> [c]onsidering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State, the exercise of personal jurisdiction by a California court over Asahi would be unreasonable and unfair.

*Asahi,* 480 U.S. at 115–116, 107 S.Ct. at 1034. In *Camelback II,* the Court of Appeals noted that "*Asahi* is 'one of those rare cases' in which traditional notions of fair play and substantial justice defeat the reasonableness of jurisdiction even though the threshold requirement of minimal contacts may have been met." *Camelback II,* 312 Md. at 336, 539 A.2d 1107. The *Camelback II* court then noted that even though the

> plaintiffs here clearly have a significant interest in obtaining relief ... [they] could have maintained this action in Penn-

sylvania without suffering unreasonable inconvenience. This State has an interest in providing a forum for its injured citizens, but we must also recognize the legitimate interests and expectations of Camelback, a resident corporation of Pennsylvania.

*Id.* at 342, 539 A.2d 1107. The Court then held that Camelback's contacts did not amount to "purposeful availment" and that Maryland could not exercise jurisdiction over the nonresident defendant. *Id.* at 342–43, 539 A.2d 1107.

We note that with respect to the fairness factors, the case sub judice is unlike *Asahi* and *Camelback*. In the instant case, as described above, *see*, section 3, *supra* at 320–24, PUH has established sufficient "minimum contacts" with the forum State. Additionally, we can think of no reason why maintaining this suit in Maryland would be detrimental to Pennsylvania or its citizens. Thus, our consideration of the fairness factors convinces us that "assumption of jurisdiction by [Maryland over PUH] would [not] offend traditional notions of fair play and substantial justice." *Camelback II,* 312 Md. at 335, 539 A.2d 1107.

We therefore conclude that, unlike the ski resort operator's contacts in *Camelback II*, PUH's contacts with Maryland were "systematic and continuous" and that PUH has purposefully availed itself of the privilege of conducting business within this State to satisfy the threshold test of minimum contacts and that it could reasonably anticipate being haled into the courts of Maryland. Accordingly, we affirm the judgment of the trial court.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY THE APPELLANT.

JAMES S. GETTY, Judge, Specially Assigned, dissenting.

Respectfully, I disagree. The majority, by affirming the decision of the trial court, necessarily concludes that Presbyterian University Hospital had sufficient contacts with the State of Maryland to justify Maryland's assumption of personal jurisdiction over this negligence action for wrongful death.

The tenuous, if not singular, reed supporting this proposition arises from Presbyterian's execution of an agreement with the Maryland State Department of Health & Mental Hygiene, plus the correspondence generated by that agreement. These provider agreements relate to medical care services available to eligible recipients of the Maryland Medical Assistance Program, and to reimbursement for services rendered. Both federal and state (Maryland Medicaid) hospital regulations for the Title XIX (Medicaid) Program require, as a condition of participation, that these provider agreements be executed.

Complying with federal and state law in order to seek reimbursement for medical services rendered in Pennsylvania to non-resident patients does not constitute, in my view, an affirmative decision by Presbyterian to conduct business in Maryland. The provider agreement is simply the mandated vehicle whereby Maryland will reimburse Presbyterian for services rendered Maryland residents who unilaterally opt to have surgical procedures performed at Presbyterian rather than elsewhere.

Presbyterian is a designated national referral center for liver, heart, and lung transplantations. The Secretary of the Maryland Department of Health & Mental Hygiene acknowledged this designation by letter to Presbyterian dated June 12, 1987, adding, "The services your hospital will provide to Maryland Medicaid recipients will be greatly appreciated." Obviously, Presbyterian would be listed in COMAR as a specialty hospital after the provider agreement was finalized. Any attempt, however, to equate a COMAR listing with a paid advertisement in the yellow pages of a telephone directory, as evidence of contacts establishing jurisdiction to maintain a lawsuit in Maryland, serves only to reinforce my conclusion that recognizable evidence of "minimum contacts" sufficient to establish jurisdiction, required by due process, does not exist in this case.

Presbyterian, clearly, in my view, has not purposefully availed itself of the privileges of conducting activities within the forum state that could lead to being subjected to personal

jurisdiction actions at law. Although Presbyterian has stated that Maryland patients account for less than one-half of one percent of the patients admitted annually, I would dismiss the numbers as being irrelevant. Whether one or five hundred Maryland residents unilaterally seek admission to the hospital in the course of a year has no bearing on the question of whether Presbyterian has engaged in activities subjecting it to the laws of the forum state.

Even if following federal and state mandates to obtain reimbursement for services rendered out-of-state patients could be construed to satisfy the "minimum contacts" making Presbyterian amenable to suit, I would hold that the subjection of Presbyterian to in personam jurisdiction in Maryland would be fundamentally unfair, substantially unjust, and a contravention of due process.

Maryland certainly has an interest in deterring negligent medical services, both intrastate and interstate. Its principal state interest, evidenced by DHMH's letter to Presbyterian, is to obtain the best medical services available for its citizens regardless of state lines. When a patient elects to cross state lines to receive professional services without having been solicited, it seems clear to me that the patient should reasonably expect that he may need to return for a periodic checkup, and that he may need to return if he needs to seek redress for services improperly rendered.

Requiring a nationally recognized specialty hospital to defend lawsuits filed in whatever jurisdiction a former patient may have returned to after discharge would be fundamentally unfair, prohibitively expensive, and not in the best interests of the hospital involved or of the patients therein. Such a result may well jeopardize the chances of non-residents being accepted by Presbyterian or any other similar institution.

I would resolve this case by applying the principles of general, not specific, jurisdiction, since the cause of action is unrelated to the contacts, thus requiring evidence of "systematic general business conduct . . . to sustain jurisdiction." *See Camelback II.* Presbyterian, without contradiction,

1. is a non-profit Pennsylvania corporation providing health care services solely in Pennsylvania;

2. owns no property, office, agents, or license to do business in Maryland; and

3. sells no products, provides no services, pays no taxes, has no telephone listing, and does not advertise or solicit business in Maryland.

The facts herein do not meet the *International Shoe* test for personal jurisdiction. Both *Camelback II* and *Gelineau v. New York University Hospital,* I believe, are dispositive of this case. I am not unmindful that this was a tragic case and the survivors had a cause of action for negligence. That cause of action, however, arose in Pennsylvania and I find no valid basis for filing the suit in Maryland other than the convenience of belatedly joining the non-resident hospital with the several Maryland defendants who were already parties to the tort action. Convenience and a strained effort to establish jurisdiction will not suffice. I would reverse the decision of the trial court.