654 A.2d 1324

**PRESBYTERIAN UNIVERSITY HOSPITAL**

v.

**Joyce WILSON et al.**

**No. 42, Sept. Term, 1994.**

Court of Appeals of Maryland.

March 9, 1995.

542

Larry A. Silverman (Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, George M. Church, F. Ford Loker, Church & Houff, P.A., Baltimore), all on brief, for petitioner.

Daniel F. Goldstein (Brown, Goldstein & Levy, John S. Singleton, Gendler, Berg & Singleton, all on brief), Baltimore, for respondent.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

In the present case, we must determine whether the Due Process Clause of the Fourteenth Amendment permits a Maryland court to exercise personal jurisdiction over a Pennsylvania hospital that provided services to a Maryland resident in Pennsylvania. We find under the circumstances of the instant case that the exercise of personal jurisdiction over the defendant hospital does not violate due process.

## I.

This case arises out of the tragic death of Hugh Eric Wilson. In January of 1985, Mr. Wilson was diagnosed by Dr. Martin B. Cooper, a Maryland gastroenterologist, with non-alcoholic cirrhosis of the liver. Mr. Wilson and his wife were informed that this condition would be fatal without a liver transplant. Mrs. Wilson then contacted Chesapeake Health Plan, Inc. (Chesapeake), a health maintenance organization (HMO) providing coverage for both herself and Mr. Wilson, to inquire about coverage for a liver transplant. She was informed by Chesapeake that it would not cover a liver trans-

plant for Mr. Wilson. Mrs. Wilson then inquired about coverage with the Maryland Medical Assistance Program (MA), which provides coverage for indigent persons. MA informed Mrs. Wilson that it would cover a liver transplant if Mr. Wilson qualified.

On August 23, 1985, Dr. Cooper contacted Dr. Thomas Starzl, who was the head of the transplant service at Presbyterian University Hospital (PUH) in Pittsburgh, Pennsylvania to discuss Mr. Wilson's condition and his need for a transplant. Despite Mr. Wilson's lack of insurance coverage, Dr. Starzl agreed to admit Mr. Wilson and told Dr. Cooper to have Mr. Wilson come to PUH the following Monday. As Dr. Starzl testified:

"My honest assessment at the time was ... that Dr. Cooper was laboring under a dictate, a decision by the governance group of this HMO that they would not allow transplantation coverage.

And that Dr. Cooper took it upon himself to say to the system, I am not going to go with this, I am going to try to sneak the patient out. That was my impression.

And that, on the other end, I told him, Dr. Cooper, I am going to take the patient, and carry on the battle."

As a result of this conversation, Donna Rinaldo, a PUH social worker, spoke with Mrs. Wilson by phone to arrange travel and accommodations for the Wilsons. The Wilsons arrived in Pittsburgh on August 25, 1985.

Upon arrival, Mr. Wilson was refused admittance to PUH because Mr. Edward Berkowitz, PUH's credit administrator, had informed the admitting office that coverage for Mr. Wilson's liver transplant had not been confirmed. After being refused admittance, the Wilsons were provided accommodations at a hostel connected with PUH. As Mrs. Wilson testified, while staying at the hostel, Dr. Starzl visited the Wilsons and spoke to them regarding his desire to perform the transplant on Mr. Wilson:

"A: He said that he wanted to transplant him. He said that he would try and get us coverage. He called a reporter.

Q: Did he say why he was calling a reporter?

A: Because he wanted to get him admitted. He figured, with pressure, that my husband would be admitted."

Additionally, the doctors at PUH told Mrs. Wilson to remain in Pittsburgh and they would mount a media campaign on Mr. Wilson's behalf. During this time, Mr. Berkowitz participated in protracted discussions with Chesapeake and Mr. Wilson's union, the International Brotherhood of Electrical Workers' (IBEW), to discuss the possibility of providing coverage for Mr. Wilson's liver transplant.

Due to deteriorating health, Mr. Wilson was admitted to the emergency room at PUH under his IBEW insurance on August 28, 1985. On Friday, August 30, 1985, Dr. Starzl wrote to Larry Payne, director of Maryland MA, regarding Mr. Wilson's condition and lack of insurance. Dr. Starzl, with Mrs. Wilson present, also telephoned Maryland MA on that day to have Mrs. Wilson discuss coverage with them and Dr. Starzl then directed Mrs. Wilson to return to Baltimore to obtain Maryland MA coverage. Mr. Wilson died on September 6, 1985, before Mrs. Wilson could obtain Maryland MA coverage and despite the fact that two suitable livers had become available to PUH for transplant during the time Mr. Wilson was in Pittsburgh.

Mrs. Wilson, individually, on behalf of her two minor daughters, and as the personal representative of Mr. Wilson's estate, brought suit in the Circuit Court for Baltimore City against PUH and several others.[1] Mrs. Wilson alleged several counts, including negligence, negligent misrepresentation, fraud, breach of contract, intentional infliction of emotional distress, and wrongful death. PUH filed a motion to dismiss for lack of personal jurisdiction which was denied after limited discovery and oral argument on the issue. PUH then filed a motion for summary judgment based on lack of personal jurisdiction,

---

1. The claims against the other defendants were settled and dismissed. PUH also filed cross-claims against the other defendants. These were voluntarily dismissed with prejudice in exchange for an agreement to reduce any jury verdict awarded against PUH.

offering in affidavits and exhibits that: 1) PUH is a non-profit organization providing services to patients in Pittsburgh, Pennsylvania; 2) PUH owns no property in Maryland and doesn't maintain an office or place of business there; 3) PUH is not and never has been licensed or authorized to do business in Maryland; 4) PUH has no agent for service of process in Maryland; 5) PUH sells no products and provides no services in Maryland; 6) PUH has no telephone listing in Maryland and derives no income from services provided in Maryland; and 7) PUH does not advertise in Maryland. In response, Mrs. Wilson alleged that jurisdiction was proper based on PUH's registration as a Maryland MA provider and its designation as a Maryland Transplant Referral Center. Mrs. Wilson asserted that PUH voluntarily solicited patients in Maryland through its Maryland MA registration and its designation as the only adult referral center for liver transplants. Mrs. Wilson also alleged that PUH "reached out to solicit Hugh Wilson, individually" and that PUH's personnel, by arranging for Mr. Wilson to come to PUH and by participating in discussions with Maryland insurers to seek coverage for Mr. Wilson, became subject to jurisdiction in Maryland. PUH's motion for summary judgment was denied after a hearing. Following the denial of PUH's motion for summary judgment, the suit proceeded to trial and a jury verdict was rendered against PUH. PUH appealed to the Court of Special Appeals, alleging that the trial court erred in exercising personal jurisdiction over PUH. *See Presbyterian Hospital v. Wilson,* 99 Md.App. 305, 637 A.2d 486 (1994). The Court of Special Appeals affirmed the trial court, finding that PUH had sufficient contacts with the State of Maryland to warrant the exercise of personal jurisdiction. *Wilson,* 99 Md.App. at 332, 637 A.2d at 500. PUH petitioned for a writ of certiorari which we granted to address whether the exercise of personal jurisdiction over PUH violates the Due Process Clause of the Fourteenth Amendment.

## II.

In affirming the trial court, the intermediate appellate court first considered a motion to dismiss PUH's appeal filed

by the Wilsons who, relying on our opinion in *Metropolitan Mtg. Fd. v. Basiliko*, 288 Md. 25, 415 A.2d 582 (1980), argued that the denial of PUH's motion for summary judgment is not reviewable after final judgment is entered. *Wilson*, 99 Md. App. at 311, 637 A.2d at 489. In *Basiliko*, Metropolitan Mortgage Fund filed suit against the Basilikos, alleging breach of certain written payment guarantee agreements. 288 Md. at 26, 415 A.2d at 583. Metropolitan submitted a motion for summary judgment which was denied. *Basiliko*, 288 Md. at 27, 415 A.2d at 583. Subsequent to the denial of summary judgment, the Basilikos filed a plea denying that they executed the note payment agreements. *Id.* The case subsequently went to trial and the trial judge entered judgment in favor of the Basilikos which was affirmed by the Court of Special Appeals on appeal. *Id.* On appeal to this Court, based solely on a review of the denial of summary judgment, we noted that summary judgment should be entered only where there is "no dispute as to any material fact." *Basiliko*, 288 Md. at 28, 415 A.2d at 584. We further held that "an appellate court should be loath indeed to overturn, on a very narrow procedural ground, a final judgment on the merits entered in favor of the party resisting the summary judgment motion." *Basiliko*, 288 Md at 29, 415 A.2d at 584. We therefore held that:

> "a denial ... of a summary judgment motion, as well as foregoing the ruling on such a motion either temporarily until later in the proceedings or for resolution by trial of the general issue, involves not only pure legal questions but also an exercise of discretion as to whether the decision should be postponed until it can be supported by a complete factual record; and we further hold that on appeal, absent clear abuse ..., the manner in which this discretion is exercised will not be disturbed."

*Id.*

In assessing the applicability of *Basiliko* to the present case, the Court of Special Appeals found that *Basiliko's*

holding was limited "to those cases in which there are factual controversies—in which the ultimate results would be determined by resolution of facts." *Wilson*, 99 Md.App. at 313, 637 A.2d at 490. The court further held:

"Where ... a motion for summary judgment is based upon a pure issue of law that could not properly be submitted to a trier of fact, as such, to resolve, the conclusion in *Basiliko* that the denial of summary judgment will not be reviewed on appeal is inapplicable. The trier of fact, whether it be a jury or a judge sitting in that capacity, could not determine the issue of personal jurisdiction, as raised in this case. Here, the motion for summary judgment is in reality nothing more than an extension of, or supplement to, the appellant's (mandatory) motion to dismiss for lack of personal jurisdiction filed in these proceedings pursuant to Md. Rule 2–322(a). The cases are legion where the issue of personal jurisdiction was reviewed by an appellate court as preserved by the filing in the lower court of a motion to dismiss for lack of personal jurisdiction."

*Wilson*, 99 Md.App. at 313–14, 637 A.2d at 490–91. The court therefore held that a review of the denial of summary judgment was proper in the instant case.

In reviewing the holding of the Court of Special Appeals, we note that under Maryland Rule 8–131(a), the issue of the jurisdiction of the trial court over a person may be reviewed as long as the party asserting a lack of jurisdiction has not waived this defense. PUH raised the defense of lack of personal jurisdiction in both a motion to dismiss and a motion for summary judgment and the issue was raised in and decided by the Court of Special Appeals. For purposes of this due process challenge to the exercise of personal jurisdiction, we shall therefore assume, without deciding, that PUH has not waived its defense to the exercise of personal jurisdiction and that the issue may be reviewed at any stage in the proceeding.

We agree with the Court of Special Appeals that PUH's motion for summary judgment was, in effect, an extension of its argument for a motion to dismiss for lack of personal

jurisdiction. *See Wilson,* 99 Md.App. at 314, 637 A.2d at 490–91. We further agree with the Court of Special Appeals's recognition that to the extent that the issue of personal jurisdiction is a question of law, it is not properly submitted to the trier of fact to resolve. *Wilson,* 99 Md.App. at 314, 637 A.2d at 490. We therefore find nothing to preclude our review of this issue.

## III.

We next turn to a consideration of whether the exercise of personal jurisdiction over PUH is proper. In finding that personal jurisdiction over PUH was proper, the Court of Special Appeals first recognized that the Supreme Court requires a defendant to have " 'minimum contacts' " with the forum state for personal jurisdiction to attach and that the exercise of jurisdiction should not offend " ' "traditional notions of fair play and substantial justice." ' " *Wilson,* 99 Md.App. at 316, 637 A.2d at 492 (quoting *International Shoe Co. v. State of Washington, Etc.,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945), in turn quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940) and *Camelback Ski Corp. v. Behning,* 307 Md. 270, 513 A.2d 874 (1986), *vacated and remanded on other grounds,* 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *opinion on remand,* 312 Md. 330, 335, 539 A.2d 1107, 1109 (*Camelback II* ), *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988)). *See also Asahi Metal Ind. v. Super. Ct. of Cal., Solano Cty.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales De Columbia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *McGee v. International Life Insurance Company,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). The court then noted the distinction we made clear in *Camelback II* regarding the necessary contacts for a finding of either specific or general jurisdiction. *Wilson,* 99 Md.App. at 317–18, 637 A.2d at 492–93. In *Camelback II* we stated:

"Generally speaking, when the cause of action does not arise out of, or is not directly related to, the conduct of the defendant within the forum, contacts reflecting continuous and systematic general business conduct will be required to sustain jurisdiction. On the other hand, when the cause of action arises out of the contacts that the defendant had with the forum, it may be entirely fair to permit the exercise of jurisdiction as to that claim." (Citations omitted).

312 Md. at 338–39, 539 A.2d at 1111. Thus, under general jurisdiction, the basis for the plaintiff's cause of action need not arise out of the defendant's contacts in the forum. *Camelback II*, 312 Md. at 338, 539 A.2d at 1111. For specific jurisdiction, the basis for the plaintiff's cause of action arises out of the defendant's contacts in the forum. *Id.*

The Wilsons have argued that PUH maintains sufficient contacts with the State of Maryland to warrant a finding of either general or specific jurisdiction. First, they argue that PUH has established continuous and systematic business contacts warranting a finding of general jurisdiction through its registration under the Code of Maryland Regulations (CO-MAR) as a Maryland MA provider and its designation, also pursuant to COMAR, as a transplant referral center. They further argue that PUH's contacts merit a finding of specific jurisdiction because this cause of action is directly related to PUH's contacts with Maryland.

The Court of Special Appeals held that, in the present case, the facts did not fit clearly into either the exercise of general or specific jurisdiction. Rather, as the trial judge had noted, "it is somewhere in between." *Wilson,* 99 Md.App at 318, 637 A.2d at 493. In such an instance, " 'the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases.' " *Id.* (quoting *Camelback II*, 312 Md. at 339, 539 A.2d at 1111). The trial judge in effect found specific jurisdiction based on a combination of PUH's contacts with Maryland and with the plaintiffs which supported both

general and specific jurisdiction. The trial judge considered these factors which in themselves may not have been sufficient to establish general jurisdiction over PUH, but which, in combination with PUH's contacts which were directly related to the present cause of action, established a basis for jurisdiction. In placing the present cause of action "on the continuum" between general and specific jurisdiction, the trial judge used general jurisdiction factors to supplement the existing facts supporting a finding of specific jurisdiction.[2] We feel that the trial judge's characterization of PUH's contacts with the State of Maryland was correct. PUH's contacts with the State of Maryland are related to the present cause of action and are sufficient to warrant a determination by the trial judge that there was at least specific personal jurisdiction over PUH. We therefore need not determine whether PUH's contacts in the State of Maryland would warrant a finding of general jurisdiction.

■ In finding that the exercise of specific jurisdiction over PUH is proper, we note that general and specific jurisdiction may involve distinct factual and legal findings. We recognize that to exercise either general or specific jurisdiction, the

---

**2.** We discussed the use of a continuum between general and specific jurisdiction in *Camelback Ski Corp. v. Behning*, 312 Md. 330, 539 A.2d 1107 (*Camelback II*), *cert. denied*, 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988), where we noted that:

"[when] the facts of a given case do not naturally place it at either end of the spectrum, there is no need to jettison the concept, or to force-fit the case. In that instance, the proper approach is to identify the approximate position of the case on the continuum that exists between the two extremes, and apply the corresponding standard, recognizing that the quantum of required contacts increases as the nexus between the contacts and the cause of action decreases."

*Camelback II*, 312 Md. at 339, 539 A.2d at 1111. In so noting, we did not mean to suggest that there is some form of jurisdiction in between general and specific jurisdiction. We merely indicated that in circumstances such as that in the instant case, where a defendant may not have sufficient contacts to support general jurisdiction, a trial judge need not segregate factors tending to support general jurisdiction from those supporting specific jurisdiction. Rather, the court may utilize factors relevant to general jurisdiction in making a determination regarding the propriety of the forum's exercise of specific personal jurisdiction over a defendant.

defendant must maintain sufficient minimum contacts with the forum such that the exercise of jurisdiction meets the "general test of essential fairness." *Camelback II,* 312 Md. at 336, 539 A.2d at 1110. However, a holding that a forum may exert general jurisdiction over a party involves a legal finding that the defendant maintains continuous and systematic contacts with the forum which constitute doing business in the forum. *See Hall,* 466 U.S. at 416, 104 S.Ct. at 1873, 80 L.Ed.2d at 412. In contrast, specific jurisdiction involves more of an expanded factual inquiry into the precise nature of the defendant's contacts with the forum, the relationship of these contacts with the cause of action, and a weighing of whether "the nature and extent of contacts ... between the forum and the defendant ... satisfy the threshold demands of fairness." *Camelback II,* 312 Md. at 336, 539 A.2d at 1110.

The trial judge, in denying the motion for summary judgment, found "from the facts" that there was the necessary purposeful availment on the part of PUH to support the exercise of personal jurisdiction over the hospital. In the instant case, we find that the facts, factual inferences, and weighing of the various factors involved in determining the existence of personal jurisdiction support the trial judge's finding that there was in effect specific jurisdiction. In one of the leading cases on specific jurisdiction, the Supreme Court held that:

> "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement [that a defendant have fair warning of being subject to suit in the forum] is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."

*Burger King,* 471 U.S. at 472, 105 S.Ct. at 2182, 85 L.Ed.2d at 540–41 (footnote omitted) (citations omitted). Thus, the Court held that Florida could assert specific jurisdiction over a Michigan franchisee of a Florida franchise chain in a claim for breach of the franchise agreement. *Burger King,* 471 U.S. at

487, 105 S.Ct. at 2190, 85 L.Ed.2d at 550. The Court found that the defendant had entered into a contract that "envisioned continuing and widereaching contacts with Burger King in Florida." *Burger King,* 471 U.S. at 480, 105 S.Ct. at 2186, 85 L.Ed.2d at 545. The Court further noted the defendant's "voluntary acceptance of the longterm and exacting regulation of his business from Burger King's Miami headquarters." *Id.* Given these purposeful contacts, the Court found that specific jurisdiction over the defendant in Florida did not violate due process.

In *Camelback II,* we held that we could not exercise jurisdiction over a Pennsylvania ski resort in a suit arising out of injuries suffered by a Maryland resident while at the resort. We noted that although the ski resort knew that Maryland residents were coming to the resort, it did not actually conduct business in Maryland:

"Camelback did not devote its energy or financial resources to the marketing of Maryland. It allocated no part of its advertising budget to Maryland, and following one very brief and unsuccessful attempt to solicit business in this State in 1982, it abandoned any attempt to include Maryland in its primary marketing area, or to conduct any active solicitation here."

*Camelback II,* 312 Md. at 341, 539 A.2d at 1112. We also noted that "[the plaintiff's] trip to Camelback did not result from any solicitation by Camelback within this State." *Camelback II,* 312 Md. at 334, 539 A.2d at 1109. We held that, given these factors and the interests of fairness in the exercise of jurisdiction, we did not have jurisdiction over Camelback. *Camelback II,* 312 Md. at 342–43, 539 A.2d at 1113. In considering the fairness of exercising jurisdiction over Camelback, we pointed out, however, that had Camelback had more contacts with Maryland, jurisdiction might have been proper. We stated:

"1) if Camelback had had additional contacts with Maryland sufficient to satisfy the 'minimum contacts' test for a threshold determination in favor of the exercise of jurisdiction over this cause of action, consideration of the factors in the

second stage [involving the fairness of exercising jurisdiction over the defendant] probably would not result in an ouster of jurisdiction; and 2) to the extent our consideration of these factors would color our judgment at all concerning the quantum of contacts required to be shown, it would operate slightly in favor of the claim that Maryland should exercise jurisdiction."

*Camelback II*, 312 Md. at 342, 539 A.2d at 1113.

We believe that the present case fits squarely within the analysis set forth in *Burger King* and our decision in *Camelback II*. We agree with the Court of Special Appeals that PUH's contacts with the State of Maryland are more significant than those of the ski resort in *Camelback II*. In the instant case, the intermediate appellate court noted that:

"PUH's contacts with Maryland began as far back as November 1982 when it applied to the Maryland Department of Health & Mental Hygiene ("DHMH") as a provider of services to Maryland MA patients. At that time, DHMH did not actively solicit hospitals to become Maryland MA providers. On July 30, 1984, PUH was designated, in accordance with the Hospital Service Regulations section of the Code Of Maryland Regulations ("COMAR"), ... as a national referral center for non-experimental organ transplants. COMAR 10.09.06.04A (effective date, October 15, 1984). As a prerequisite, PUH had to comply with several requirements including being certified as a Medicaid provider. * * * Thus, PUH had to comply with numerous requirements to be designated as a Maryland MA provider and as a national referral center."

*Wilson*, 99 Md.App. at 321–22, 637 A.2d at 494.[3] Unlike the ski resort in *Camelback II*, which did nothing to actively solicit

---

**3.** Although neither the trial judge nor the Court of Special Appeals relied significantly on PUH's income from Maryland patients in finding personal jurisdiction proper, the Court of Special Appeals did note the income received by PUH for the treatment of Maryland MA patients:

"PUH's own figures show that in fiscal year 1984–85 two patients received liver transplants, for which PUH received $105,428.00 from

Maryland residents, PUH's voluntary efforts to register as a Maryland MA provider and to be designated as a liver transplant referral center served in many respects to effectively solicit Maryland residents to seek treatment at PUH. These general business contacts are directly related to the present cause of action and serve as support for the finding of specific jurisdiction. In Mr. Wilson's case, it is precisely PUH's Maryland MA provider status and its transplant abilities which initially drew him to PUH for treatment. PUH was, in all respects, the only place where Mr. Wilson could receive treatment. Further, Mr. Wilson had been told by PUH, through Dr. Starzl and Donna Rinaldo, that he would be treated at PUH and it was for this reason that Mr. Wilson came to Pennsylvania. At the time Mr. Wilson needed a liver transplant, PUH was the only approved site for liver transplants for Maryland MA patients. *See* former Md.Regs.Code, tit. 10 § 09.06.04A(15)(a)(ii) (Supp. 32) (1987). Additionally, at all relevant times, no hospital in Maryland performed liver transplants. Maryland did not solicit PUH's participation as a national referral center; rather PUH actively sought to be so designated by fulfilling the necessary requirements as set forth in former Md.Regs.Code., tit. 10 § 09.06.04A(14) (Supp. 32) (1987). Thus, PUH was not only aware that Maryland patients would come to its facility, it placed itself in a position to purposefully attract such patients. In the present case, these actions served to attract Mr. Wilson. Further, by registering as a Maryland MA provider, PUH agreed to be governed by the standards and requirements for this program set forth by the State of Maryland. PUH, by registering as a Maryland MA provider and by becoming the only approved adult liver transplant center in the State of Maryland, pur-

Maryland MA. In fiscal year 1986–87, PUH treated seventy-eight Maryland patients and received $2,264,169.00 from Maryland. Similarly, in fiscal year 1987–88, PUH treated seventy-two Maryland patients and was reimbursed $2,333,114.00 from Maryland."
*Presbyterian Hospital v. Wilson*, 99 Md.App. 305, 322, 637 A.2d 486, 495 (1994).

posefully availed itself of the benefits conferred upon it by the State of Maryland.

Aside from those general business contacts of PUH which, because of their relation to the present cause of action, support the trial judge's finding of jurisdiction, PUH established other contacts in Maryland directly related to the Wilsons' cause of action which support a finding of specific jurisdiction. It was through Dr. Cooper's conversation with Dr. Starzl at PUH that Mr. Wilson was initially induced to come to PUH. Additionally, PUH, through Donna Rinaldo, made the arrangements for Mr. Wilson's trip to Pennsylvania. Further, through its personnel, PUH carried out protracted discussions via letters and phone calls to Maryland MA, Chesapeake, and IBEW in an effort to determine Mr. Wilson's insurance coverage for a liver transplant. PUH convinced the Wilsons to remain in Pennsylvania while it tried to arrange for Mr. Wilson's treatment. These were purposeful, voluntary contacts with the State of Maryland which are directly related to the present cause of action. As such, we find the requisite minimum contacts to warrant a finding of specific jurisdiction.

In a case factually similar to that before us, the United States Court of Appeals for the Ninth Circuit found the requisite minimum contacts to warrant the exercise of specific jurisdiction over Arizona doctors being sued for malpractice in California by a California resident who was treated by the doctors in Arizona. *See Cubbage v. Merchent,* 744 F.2d 665 (9th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). The *Cubbage* court held that in order to exercise specific jurisdiction over the defendant consistent with due process, the following test must be met:

> "(A) some action must be taken whereby defendant purposefully avails himself or herself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of the forum's laws; (B) the claim must arise out of or result from defendant's forum-related activities; and (C) exercise of jurisdiction must be reasonable." (Citation omitted).

744 F.2d at 668. The court noted that the defendant doctors had applied for and received Medi–Cal numbers which permitted them to receive reimbursement from California for services provided to eligible California residents. *Id.* It further recognized that the doctors were listed in the white pages of the local California phone directory and the hospital in which they performed services was listed in the yellow pages. *Id.* The court held that California could maintain jurisdiction over the doctors because:

> "[A]ppellees' relevant contacts with California were the obtaining of a Medi–Cal number and the placing of a telephone listing (and for the hospital, a yellow pages advertisement) in a local phone directory distributed in the adjacent California area. Through directory solicitation and participation in a state health care program appellees were able to attract a substantial number of patients from California. Furthermore, appellees' forum activities were enhanced by appellant's California residence because that residence is the focus of appellees' activities out of which the suit arises."

*Cubbage,* 744 F.2d at 670. While PUH attempts to distinguish *Cubbage* from the present case on the basis that jurisdiction in *Cubbage* was based on the defendants' advertising within the forum, we do not view this as a significant distinction. PUH's registration as a Maryland MA provider was a form of direct solicitation of needy Maryland patients. Additionally, PUH voluntarily placed itself in the position to be the only site for liver transplants for Maryland MA patients. PUH not only was aware that Maryland patients were using its facilities, it sought out these patients. PUH's activities in Maryland to solicit Maryland patients in general, and Mr. Wilson in particular, resulted in the transaction of business which forms the basis for the present cause of action. *See Shute v. Carnival Cruise Lines,* 897 F.2d 377, 381 (9th Cir.1990) ("a non-resident defendant's act of soliciting business in the forum state will generally be considered purposeful availment if that solicitation results in contract negotiations or the transaction of business."), *rev'd on other grounds,* 499 U.S. 585, 111 S.Ct.

1522, 113 L.Ed.2d 622 (1991); *Lanier v. American Bd. of Endodontics,* 843 F.2d 901, 908–09 (6th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988); *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1270 n. 21 (5th Cir.1981) (both suggesting that a cause of action arises out of a defendant's conduct if the cause of action would not have occurred "but for" the defendant's contacts with the forum).

Similarly, in *Kennedy v. Freeman,* 919 F.2d 126 (10th Cir.1990), the United States Court of Appeals for the Tenth Circuit held that Oklahoma could exercise specific jurisdiction over a Texas physician who accepted a sample of a lesion from an Oklahoma resident for testing. In *Kennedy,* a physician sent a report back to Oklahoma which erroneously indicated that the lesion was much smaller than it actually was. This mistaken measurement resulted in a failure to properly treat the plaintiff until the melanoma had spread significantly. The court found that in order to exercise specific jurisdiction, "the defendant must do some act that represents an effort by the defendant to 'purposefully avail[ ] itself of the privilege of conducting activities within the forum State.' A defendant does so when she purposefully directs her foreign acts so that they have an effect in the forum state." *Kennedy,* 919 F.2d at 128 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283, 1298 (1958)) (additional citations omitted). The court held that the physician's contacts were sufficient to establish jurisdiction:

> "While [the physician] did not solicit [the plaintiff's] business in Oklahoma, he did purposefully direct his actions there. He willingly accepted the sample from Oklahoma; he signed a report establishing the thickness of [the] lesion; and he evidently sent his bill there. [The physician] rendered his diagnosis to [the plaintiff] in Oklahoma, through the mail, knowing its extreme significance and that it would be the basis of [the plaintiff's] further treatment there."

*Kennedy,* 919 F.2d at 129.

Without approving the holding, we note that in *Cornelison v. Chaney,* 16 Cal.3d 143, 127 Cal.Rptr. 352, 545 P.2d 264

(1976), the California Supreme Court held that California could exercise jurisdiction over a Nebraska resident who killed a California resident in a truck accident occurring in Nevada. *Cornelison,* 127 Cal.Rptr. at 357, 545 P.2d at 269. The defendant, a trucker engaged in the business of hauling goods, made approximately twenty trips each year to California for his business. The accident occurred while defendant was in route to California. *Cornelison,* 127 Cal.Rptr. at 354, 545 P.2d at 266. Assessing the defendant's contacts with California, the court held that the defendant's activities in the forum were not "so substantial or wide-ranging" as to substantiate the exercise of general jurisdiction. *Cornelison,* 127 Cal.Rptr. at 355, 545 P.2d at 267. Nonetheless, the court found sufficient facts to support the exercise of specific jurisdiction, noting:

> "[The] defendant has been engaged in a continuous course of conduct that has brought him into the state almost twice a month for seven years as a trucker under a California license. The accident occurred not far from the California border, while defendant was bound for this state. He was not only bringing goods into California for a local manufacturer, but he intended to receive merchandise here for delivery elsewhere. The accident arose out of the driving of the truck, the very activity which was the essential basis of defendant's contacts with this state. These factors demonstrate, in our view, a substantial nexus between plaintiff's cause of action and defendant's activities in California."

*Cornelison,* 127 Cal.Rptr. at 355–56, 545 P.2d at 267–68. The *Cornelison* court noted the Supreme Court's decision in *McGee* in which a nonresident insurance company was required to defend an action in California. *Cornelison,* 127 Cal.Rptr. at 356 n. 7, 545 P.2d at 268 n. 7. In *McGee,* the defendant's sole contact with the state was the solicitation and receipt of premiums for the insurance contract out of which the suit arose. *McGee,* 355 U.S. at 222, 78 S.Ct. at 200, 2 L.Ed.2d at 225. Recognizing that the accident giving rise to the plaintiff's cause of action did not occur in California, the *Cornelison* court found that the defendant's contacts were far more extensive than that of the defendant in *McGee. Corneli-*

*son,* 127 Cal.Rptr. at 356, 545 P.2d at 268. The court noted that the exercise of personal jurisdiction does not follow a rigid test, but instead depends on the "quality and nature of the activity of the defendant in the state seeking to exercise jurisdiction over him, fairness to the parties, and the orderly administration of the law." *Cornelison,* 127 Cal.Rptr. at 356, 545 P.2d at 268. The court therefore held that the exercise of specific jurisdiction over the defendant would not violate due process. *Cornelison,* 127 Cal.Rptr. at 357, 545 P.2d at 269.[4]

We find the reasoning of *Cubbage, Kennedy,* and *Cornelison* to be instructive in the present case. PUH, like the defendants in *Cubbage, Kennedy,* and *Cornelison* purposefully availed itself of the benefits and protections of the State of Maryland through its registration as a Maryland MA provider and its designation as a transplant referral center. In so doing, it actively solicited Maryland MA patients, and specifically solicited Mr. Wilson.

We further reject PUH's argument that the exercise of personal jurisdiction over the hospital is unfair and unreasonable. In *Camelback II,* we set forth the relevant factors to be considered in determining whether the exercise of personal jurisdiction over a foreign defendant was unfair. These factors include:

> "the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversy; and the shared interest of the several states in furthering fundamental substantive social policies."

312 Md. at 342, 539 A.2d at 1112 (citing *Asahi,* 480 U.S. at 113, 107 S.Ct. at 1033, 94 L.Ed.2d at 105). In the present case, we see no undue burden on PUH in having to travel to Maryland

---

**4.** *See generally* Eugene F. Scoles and Peter Hay, *Conflict of Laws* 306–08 (2d. ed. 1992) (discussing *Cornelison v. Chaney,* 16 Cal.3d 143, 127 Cal.Rptr. 352, 545 P.2d 264 (1976) and the general concept of the exercise of jurisdiction over causes of action occurring outside of the forum but related to forum activities).

to answer the suit. We note the plaintiffs', all residents of Maryland, strong interest in obtaining relief for the death of their husband and father. We also reject PUH's argument that the exercise of personal jurisdiction over PUH would have the chilling effect of influencing hospitals in other jurisdictions not to accept Maryland MA patients. As the Tenth Circuit made clear in *Kennedy:*

> "[W]hen a doctor purposefully directs her activities at the forum state, the state has a greater interest in deterring medical malpractice against its residents. The district court's concerns [that the exercise of personal jurisdiction over a non-resident defendant doctor would have a chilling effect on services provided to residents] are placed in their proper perspective when one considers that suits against doctors are always available in their home states. Thus, finding jurisdiction in this type of case will have only an incremental deterrent effect on doctors who provide health care to citizens of foreign states." (Citations omitted).

919 F.2d at 129. We therefore find no reason why the exercise of specific personal jurisdiction over PUH would offend traditional notions of fair play and substantial justice.

## IV.

PUH purposefully availed itself of the benefits and protections of the State of Maryland through its registration as a Maryland MA provider and its designation as a transplant referral center. These contacts were the reasons for Mr. Wilson going to PUH to seek treatment. We further find that, in inviting and arranging for Mr. Wilson to come to PUH, in convincing him to remain in Pennsylvania, and in initiating discussions regarding coverage for Mr. Wilson with various insurance providers in Maryland, PUH established contacts within the State of Maryland which are directly related to the present cause of action. For these reasons, we find that the trial judge did not err in finding that PUH had sufficient contacts within Maryland so that the exercise of specific personal jurisdiction over PUH does not violate due

process and does not offend traditional notions of fair play and substantial justice.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY APPELLANT.*