696 A.2d 511

MAYOR AND CITY COUNCIL OF BALTIMORE

v.

Joseph Charles SCHWING, Jr.

No. 1693, Sept. Term, 1996.

Court of Special Appeals of Maryland.

July 9, 1997.

406

Herbert Burgunder, Jr., Principal Counsel and Amaza S. Reid, Assistant Solicitor (Otho M. Thompson, City Solicitor and Frank C. Derr, Deputy City Solicitor, on the brief), Baltimore, for Appellant.

Harvey Greenberg, Towson, for Appellee.

Argued before MURPHY, C.J., DAVIS, J., and THEODORE G. BLOOM, Judge (retired) Specially Assigned.

DAVIS, Judge.

The Mayor and City Council of Baltimore (the City) appeals from an Order of the Circuit Court for Baltimore City dated September 27, 1996. The circuit court had remanded the case to the Workers' Compensation Commission for further proceedings on a claim for benefits filed in 1983, which the circuit court held was not barred by the applicable limitations period and which rendered a claim, filed in 1994 for the same injury, superfluous and unnecessary. The court set forth its decision and reasoning in a Memorandum Opinion. Joseph Charles Schwing, Jr., (the claimant or Schwing) the claimant of the benefits, cross-appealed from that Order. On December 17, 1996, the circuit court issued, *sua sponte,* a Memorandum Opinion Addendum that purported to supplement the original Order and Memorandum Opinion. The City presents the following questions for our review:

I. Did the circuit court have jurisdiction to decide whether Claim No. A–895606, filed on June 23, 1983, was barred by the limitations provision of § 9–736 of the Workers' Compensation Law of Maryland?

II. Did the circuit court have jurisdiction to issue its Memorandum Opinion Addendum of December 17, 1996?

III. Was the circuit court's September 1996 opinion correct that Claim No. B–309534, filed March 10, 1994, is barred by limitations? [1]

We answer the first and third questions in the negative. We need not address the second question. We reverse the decision of the circuit court.

## FACTS

The claimant contracted heart disease as a result of his duties as a fire fighter with the Baltimore City Fire Department. On December 2, 1982, at the age of forty-two, he suffered a heart attack. He was unable to work from December 2, 1982 until the first week of February, 1983.[2] In July, 1983, he underwent a cardiac catheterization and was again unable to work from July 12 to July 15, 1983. The City paid Schwing his full salary for the periods he was unable to work, under a collective bargaining agreement between the City and the fire fighters' union, which provided for payment of full salary for six months from the date of the injury, regardless of whether the illness or injury was suffered in the line of duty. The claimant's medical expenses were paid by his health insurer.

Schwing filed Claim No. A–895606 (Claim A) with the Workers' Compensation Commission of Maryland (Commission) on May 23, 1983. He stated in Claim A that December 3, 1982 was the first day he could not work and that he performed no work during the "period of disability." The City filed issues contesting the claim and impleading the Subsequent Injury Fund (Fund).

---

**1.** Although the question is framed in terms of the court's ruling that the 1994 claim is barred by limitations, the court actually held that the claimant's disablement in 1983 tolled the statute of limitations, then, after the parties appealed, filed a Memorandum Opinion Addendum ruling that, because the claimant was not incapacitated in 1983, the second claim was not barred by the statute of limitations.

**2.** The City stated that the claimant returned to work on February 3, 1983. The claimant stated that he returned on February 7.

On June 21, 1983, the Commission ordered Schwing and the City to file a stipulation that, *inter alia,* they had sent to the Fund Schwing's medical records and copies of all filings in Claim A. The Commission's Order stated that the matter would not be set for a hearing on the merits of the claim until the parties had filed the stipulation. This written Order is the last record of any action pertaining to Claim A.

Schwing's heart condition was monitored after his hospitalization, and although he was in general good health, his cardiac condition deteriorated. Nevertheless, he performed his regular duties as a fire fighter until December 9, 1993, when, as a result of an abnormal stress thallium test, he underwent a catheterization. On December 16, 1993, he underwent quadruple bypass surgery. He was unable to work from December 9, 1993 until February 25, 1994, when he returned to duty as a fire fighter.

On March 10, 1994, the claimant filed Claim B–309534 (Claim B) with the Commission, alleging that he suffered from an occupational disease—specifically, cardiovascular disease triggered by "artery blockage and heart damage from infarctions." He stated on his claim that he had filed no previous claim for this occupational disease.[3] On April 18, 1994, the City filed issues on Claim B, alleging, *inter alia,* that Claim B was barred by limitations.

At the Commission hearing on July 25, 1994, the City argued that Claim B was barred by limitations because the claimant had filed Claim A in 1983 for the same occupational disease. The City contended that Schwing was obligated to proceed under Claim A, which was never resolved. For his part, the claimant contended that the heart attack that

---

**3.** The City argues that Claim B was for temporary total disablement resulting from Schwing's 1993 recuperation from the bypass surgery. The claimant argues that he has suffered permanent partial disability because, although he returned to the fire department, he never again actually fought fires. As we explain, *infra,* the nature of the claimant's 1993 disablement must be determined on remand, but whether it was permanent partial disablement or temporary total disablement does not affect our decision in this appeal.

prompted Claim A was not the cardiovascular disease that had slowly developed since then, for which Claim B was filed. His counsel argued:

> What happened in 1982 has nothing to do with the cardio-vascular disease that has been developing over the course of time, for which he had his quadruple bypass and for which he had a second myocardial infarction recently, so I don't think the '82 claim has a thing to do with it.

The Commission disagreed, concluding that the 1982 heart attack was caused by cardiovascular disease, and that this disease was the same occupational illness for which the claimant filed Claim B. The Commission expressly stated that its ruling stemmed from a "layman's understanding" of the nature of cardiovascular disease; it urged the claimant to appeal the decision.

Schwing did. After the Commission's record was filed in the circuit court, the City filed a Motion for Summary Judgment. In its Motion, the City alleged that Claim B was time-barred by MD.CODE (1991 Repl.Vol.), § 9–711 of the LAB. & EMPL. ART. (L.E.), which requires a covered employee to file a claim with the Commission within two years of, *inter alia,* a disablement suffered as a result of an occupational disease, or the date on which the covered employee first had actual knowledge that the disablement was caused by the employment. L.E. § 9–711(a). Arguing that Schwing's current cardiovascular disease was an aggravation of the same condition he had in 1983, the City maintained that he was precluded from filing a new claim based on this preexisting, albeit aggravated, condition. The City also argued that *Waskiewicz v. General Motors Corp.,* 342 Md. 699, 679 A.2d 1094 (1996), prevented a claimant from basing a claim for benefits upon continuous exposures that caused the worsening of a pre-existing disease, for which a claim had already been filed.

In response, the claimant argued that he suffered no disablement in 1983 that triggered the running of the two-year limitations period, because he was able to resume his duties after his heart attack and because he was paid wages under

the labor agreement, not as injured workers' compensation. He also argued that *Waskiewicz* was inapposite because the Court of Appeals in that case addressed the issue of a new claim following an old claim for which benefits had been paid. Schwing had not received benefits under Claim A because his 1983 medical expenses were paid through private insurance and because his lost wage payments resulted from a labor agreement, not a workers' compensation claim.

On September 10, 1996, the circuit court determined that Schwing suffered a disability by virtue of the heart attack that caused him to miss work for approximately two months in 1982 and 1983. Because he filed Claim A within six months after his disability, the court ruled that L.E. § 9–711 was inapplicable. In addition, the court ruled that *Waskiewicz* may not apply because a factual dispute existed as to whether the claimant ever *claimed* benefits under Claim A—that is, both parties disagreed as to the source of his payments for medical expenses, although they agreed that payments for lost wages resulted from a labor agreement rather than disability benefits. The court denied the City's Motion for Summary Judgment as premature.

Schwing filed a Motion for Summary Judgment on September 18, 1996, and the City filed a Cross–Motion for Summary Judgment. They renewed the arguments made during the first summary judgment hearing. The circuit court held a hearing on September 26, 1996. At the hearing, counsel for the City stated that there were no material disputes of fact, arguing that Schwing became "disabled" when he missed work in 1982 and 1983. The City also asserted that the viability of Claim A was not before the court; the appeal from the Commission's decision in Claim B was the only matter at issue.

The court focused on two arguments by the claimant—first, that he had remained on active duty until his quadruple bypass operation and therefore suffered no "disablement" until 1993; and second, because there was never an award given under Claim A, *Waskiewicz,* which dealt with modifica-

tion of awards under L.E. § 9–736, is inapplicable.[4] The court issued an opinion orally on the record, reserving the right to make "nonsubstantive, editorial changes" before release. The court concluded that the claimant suffered his initial disablement in 1982, with the first heart attack and subsequent absence from work. His filing of Claim A tolled the two-year limitations period of L.E. § 9–711. The court concluded that *Waskiewicz* and L.E. § 9–736 were inapplicable because the Commission never made an award from which the claimant could have petitioned for a modification. Thus, the court concluded that Claim B was unnecessary and superfluous, and Schwing was free to pursue Claim A, unhindered by the limitations period of L.E. § 9–711.

After both parties had appealed from this Order, the court, on December 19, 1996, filed a Memorandum Opinion Addendum that contradicted the reasoning given in the original Memorandum Opinion. Abandoning its earlier position on the issue of when the claimant became disabled, the court reasoned that he suffered no "disablement" as a result of the 1982 heart attack but only after he underwent quadruple bypass surgery and was unable to continue his duties as before. In the following passage, the court appeared both to conclude that the claimant was not disabled as a matter of law as a result of the 1982 heart attack, and to provide an alternative reason for recovery should the Commission decide that he did indeed suffer disablement from the heart attack:

> In summary, for the reasons set forth in the original opinion on the record, if it were to be decided that Mr. Schwing not only was diagnosed with an occupational disease in 1982 when he first had a heart attack *but also was incapacitated,* then he should be permitted to pursue his first claim as there was never any adjudication on it. In the alternative, in view of the fact that he was able to continue

---

4. L.E. § 9–736(b)(3) reads:

> (3) Except as provided in subsection (c) of this section, the Commission may not modify an award unless the modification is applied for within 5 years after the last compensation payment.

his employment for ten years and suffered no adverse change in wage earning, *he did not become disabled or incapacitated* because of the cardio-vascular disease until the by-pass surgery in December, 1993. Therefore, the second claim he filed in March, 1994, is not barred by the statute of limitations. For these reasons, albeit in the alternative, the decision of the Worker's [sic] Compensation Commission is REVERSED.

Neither party filed an appeal from this "Memorandum Opinion Addendum."

## DISCUSSION

MARYLAND RULE 2–501(e) (1997) states, in relevant part:

The court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

We review on appeal whether the lower court was legally correct. *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 592, 578 A.2d 1202 (1990); *Pope v. Board of Sch. Comm'rs*, 106 Md.App. 578, 590, 665 A.2d 713 (1995), *cert. denied*, 342 Md. 116, 673 A.2d 707 (1996). The nonmoving party gets the benefit of all favorable inferences that may reasonably be drawn from the facts. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). If any fact, or any inference of fact, is in dispute, and that dispute would affect the outcome of the controversy, then summary judgment is inappropriate. *Id.* This standard is akin to a directed verdict; i.e., whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 244, 603 A.2d 1357 (1992).

■ The City argues that we should not consider the circuit court's Memorandum Opinion Addendum because jurisdiction had vested in this Court before its issuance. Schwing counters with an argument that the circuit court was merely acting within its power to preserve matters for appeal. We think it

unnecessary to decide between these two arguments, however. In its two opinions, the circuit court made basically three decisions. In the first Memorandum Opinion, which granted the claimant's Motion for Summary Judgment, it decided that Schwing had suffered "disablement" from his occupational disease in 1982, and it decided that L.E. § 9–736 does not apply because there was no compensation paid to him. In its Addendum, the court changed its mind and decided that Schwing suffered compensable "disablement" in 1993. Both parties appealed from the first judgment, but not from the Memorandum Opinion Addendum. Because the claimant appealed from the first judgment, the question of when he was "disabled" is squarely before us on his cross-appeal, if the question is one of law. If the court's first decision on that issue is legally incorrect, we may reverse it.

If the question of disablement is one of fact, however, the situation changes. If the circuit court had issued its memorandum opinions after a trial on the merits, we could safely ignore the issuance of the Addendum yet still utilize the reasoning within it, if correct, to affirm the court's decision on a ground not relied upon by the circuit court. *Offutt v. Montgomery County Bd. of Education*, 285 Md. 557, 563 n. 3, 404 A.2d 281 (1979); *Van Wyk, Inc. v. Fruitrade Int'l*, 98 Md.App. 662, 669, 635 A.2d 14 (1994). Because the appeal is from the entry of summary judgment, however, our review may be more limited. Ordinarily, we may not affirm an entry of summary judgment for reasons other than those relied upon by the circuit court, if the alternative reason is one upon which the circuit court had discretion to deny summary judgment. *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995); *Brown v. Wheeler*, 109 Md.App. 710, 717, 675 A.2d 1032 (1996). Further problems with alternative grounds for affirmance arise because a circuit court generally has the discretion to defer or deny a Motion for Summary Judgment even when material facts are undisputed. *Presbyterian Univ. Hospital v. Wilson*, 99 Md.App. 305, 313, 637 A.2d 486 (1994), *aff'd*, 337 Md. 541, 654 A.2d 1324 (1995). It is only when the motion is based upon a pure issue of law, and not properly

submitted to a trier of fact, that we may affirm on an alternate ground. *Id.* at 313–14, 637 A.2d 486.

■ In this case, however, the possible factual nature of the question presents no obstacle. Because the claimant appealed from the circuit court's decision that he was disabled in 1982, we may review the correctness of the grant of summary judgment in the manner in which we review all grants of summary judgment—if the material facts are disputed (in this case, if the date of disablement is a factual, rather than legal question), then summary judgment was improperly granted. *King,* 303 Md. at 111, 492 A.2d 608.[5] That is, although the circuit court may have had the discretion to deny summary judgment even when the material facts are undisputed, the converse is not true. The court abuses its discretion when it grants a Motion for Summary Judgment in the face of disputed material facts. *Id.*

In short, no matter how one views the procedural posture of the case, we may effectively consider the rationale set forth in the Addendum, either for the purpose of affirming the court's grant of summary judgment to the claimant, or for the purpose of reversing its decision regarding disablement in the first Memorandum Opinion as either legally incorrect or as improperly granted in the face of disputed material facts. In addition, whether we reverse the court's decision in the Addendum or affirm its first decision on the issue, we consider the same questions: are there material facts in dispute that determine when the claimant suffered a disability? If so, the rationales of both opinions are incorrect on this issue, and the circuit court's judgment rises and falls on its alternate ground for summary judgment. If not, the question is legal in nature, and the diametric opposition of both of the circuit court's conclusions on disability compels an examination and resolution of the question as a matter of law.

---

**5.** For the moment, we disregard the circuit court's other rationale in its Memorandum Opinion.

## ANALYSIS

### I

 Once a payment is made on an award for a temporary disability, any reopening of the claim, even when the disability has since become permanent, is subject to the reopening provisions of L.E. § 9–736. *Vest v. Giant Food Stores, Inc.*, 329 Md. 461, 476–78, 620 A.2d 340 (1993). This has been established beyond question. Nevertheless, in deciding that L.E. § 9–736 would not bar the pursuit of Claim A, the circuit court held that any payments made to the claimant under the collective bargaining agreement did not constitute "compensation payments" of an "award" that would trigger the application of L.E. § 9–736. The City argues that the circuit court had no authority to consider that question for three reasons. First, the issue was relevant to the viability of Claim A only, and the question of the viability of Claim A was not before the circuit court. Second, whether the payments under the Agreement were "compensation payments" within the scope of L.E. § 9–736 is a question of fact and, because the Commission made no findings on the issue, it should not have been decided by the circuit court. Third, the City argues that the Fund was not a party to Claim B, only Claim A; should we allow the circuit court's ruling on the applicability of L.E. § 9–736 to stand, the Fund would be denied all opportunity to defend on the issue of limitations as to Claim A.

We agree with the City's first and third arguments and need not discuss the second. Simply put, the hearings before the Commission and the circuit court were to determine the viability of Claim B, filed in 1994, not Claim A, filed in 1982. The City contended only that L.E. § 9–711 barred Claim B, not that L.E. § 9–736 barred Claim A *and* Claim B.[6] The City relies solely upon that argument in this Court, as well.

---

6. Had the City argued that L.E. § 9–736 barred Claim B as an application for an increase in benefits, the issue of whether compensation payments were made under Claim A would necessarily be before us. As it is, however, the City has by its own arguments waived any claim that Claim B is barred by L.E. § 9–736.

Moreover, the Fund was impleaded on Claim A and must be given an opportunity to raise any defenses with regard to that claim, in an adjudication reserved for that claim. *See Subsequent Injury Fund v. Ehrman,* 89 Md.App. 741, 752, 599 A.2d 875 (1992). We shall assume, for the purposes of this appeal—and solely because The City has waived an objection to this assumption—that the payments under the Agreement were not compensation payments that would subject Claim B to the limitations provision of L.E. § 9–736(b)(3). The only questions before us, then, are whether the claimant suffered a disability in 1993 that was compensable under L.E. § 9–502(c), and if so, whether L.E. § 9–711 bars it. We address these questions together.

## II

The limitations period of L.E. § 9–711 (which covers occupational diseases) runs, at the earliest, from the date of disablement, not from the date of the onset of the occupational disease. *Id.* at 474. L.E. § 9–711 reads, in relevant part:

(a) *Filing claim.*—If a covered employee suffers a disablement or death as a result of an occupational disease, the covered employee or the dependents of the covered employee shall file a claim with the Commission within 2 years, or in the case of pulmonary dust disease within 3 years, after the date:

(1) of disablement or death; or

(2) when the covered employee or the dependents of the covered employee first had actual knowledge that the disablement was caused by the employment.

(b) *Failure to file claim.*—Unless waived under subsection (c) of this section, failure to file a claim in accordance with subsection (a) of this section bars a claim under this title.

At the hearing in the circuit court, Schwing conceded that his heart attack in 1982 and the quadruple bypass operation in

1993 stemmed from the same underlying heart disease.[7] His principal contention, below and on appeal, is that this incipient heart disease did not result in permanent partial disablement until 1993. Only when he was hospitalized for the quadruple bypass surgery, Schwing argues, did the limitations period of L.E. § 9–711 begin to run, for after that date he never resumed his full duties as a fire fighter and suffered permanent partial disablement.

■ L.E. § 9–502(c) states that an employer must provide compensation to a covered employee for disability resulting from an occupational disease. *Id.* Section 9–101(g), which defines an "occupational disease," specifies that incapacitation is an integral element of a compensable occupational disease, and "may take on four main forms: (1) temporary partial incapacitation; (2) temporary total incapacitation; (3) permanent partial incapacitation; and (4) permanent total incapacitation." *Helinski v. C & P Tel. Co.,* 108 Md.App. 461, 470, 672 A.2d 155 (1996); L.E. § 9–101(g). *Accord Bowen v. Smith,* 342 Md. 449, 456, 677 A.2d 81 (1996). "Disablement," the triggering event for the limitations period of L.E. § 9–711 and a necessary precondition for compensation under L.E. § 9–502(c), is equivalent to incapacitation in the occupational disease context. *Helinski,* 108 Md.App. at 471, 672 A.2d 155. The following definitional section links the two terms:

(a) *"Disablement" defined.*—In this section, "disablement" means the event of a covered employee becoming partially or totally incapacitated:

(1) because of an occupational disease; and

(2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease.

---

**7.** L.E. § 9–503(a) creates a presumption that heart disease contracted by a fire fighter who meets certain criteria is an occupational disease.

L.E. § 9–502(a). The incapacity, as is evident from L.E. § 9–502(a)(2), must relate to the requirements of the job last performed under the hazards of the disease.

■ The questions posed by the City are whether the claimant suffered a temporary total disability within the meaning of L.E. § 9–502 when he was hospitalized in 1982 after his heart attack, and whether this disability started the clock on a limitations period that, when expired, forever foreclosed a claim for another kind of disability caused by the same occupational disease. We conclude first, as a matter of law, that he did suffer a temporary total disability in 1983. The facts are undisputed. Schwing conceded in the circuit court, although he briefly argued differently before the Commission, that he suffered from cardiovascular disease that resulted in a heart attack in 1982. He was hospitalized for approximately two months, from the beginning of December 1982 to the beginning of February 1983. During this time, he performed no duties as a fire fighter. Based on the plain language of the statute, the claimant suffered a temporary, total incapacitation during this brief period.

That he returned to his former duties, with no reduction in capability, is of no consequence. *See Helinski,* 108 Md.App. at 470, 672 A.2d 155 ("[A] covered employee may ... progress from [temporary total incapacitation] to full health."). Indeed, as the City aptly argues, any other conclusion would be inconsistent with the statutory provisions providing for benefits in cases of temporary and partial disability. The very existence of these provisions contemplates benefits to covered employees who are temporarily incapacitated and who then return to work in their former capacity.

■ That the claimant suffered no wage loss because of the labor agreement is similarly irrelevant. "Absent any other evidence of actual incapacity, a showing of lack of wage loss might justify a fact-finder in concluding that there was no actual incapacity. But proving actual wage loss is not a *sine qua non* of obtaining compensation for occupational disease."

*Miller v. Western Electric Co.,* 310 Md. 173, 188, 528 A.2d 486 (1987).

## III

 It is crucial at this point to focus the analysis that we are about to undertake. Schwing filed claims within two years of both the 1982 temporary total disability and the disability suffered in 1993. He tolled the limitations period of L.E. § 9–711 as to both claims. Thus, L.E. § 9–711, by its very terms, cannot operate to bar Claim B. It is equally clear—and undisputed—that the claimant required quadruple bypass surgery as a result of his occupational heart disease and that, as a result, he was again disabled from performing his duties as a fire fighter.[8]

 In addition, it is undisputed that, had the claimant not suffered a heart attack in 1982, the disability he suffered as a result of his 1993 surgery would be compensable under L.E. § 9–502. Thus, it appears that the only barrier to compensability is L.E. § 9–736—not, as we have discussed, in the sense that L.E. § 9–736 may strictly apply to bar Claim B (for the City has waived this argument on appeal), but in a different sense; the *enactment* of L.E. § 9–736 may indicate by itself that the General Assembly intended that neither the escalation of a temporary total to a permanent disability, nor a second temporary total disability, be a separately compensable "disablement" under L.E. § 9–502. Thus, as in *Waskiewicz, supra,* we must determine whether the claimant suffered a "disability" in 1993 that is compensable under L.E. § 9–502, or whether his latest disability *is of such a nature* that it should not be treated as separate from the 1982 disability. If we decide the latter, then Schwing is constrained, as discussed *supra,* to pursue Claim A before the Commission. If his 1993

---

**8.** Again, we note that both parties dispute the nature of the disability suffered in 1993; our decision remains the same, but for different reasons, regardless of whether the disability of Claim B was temporary total disability or permanent partial disability.

disability is a new disability, separately compensable from that suffered in 1982, then Claim B survives.

We conclude that the disablement suffered in 1993 was a separately compensable disablement than that suffered in 1982. The 1982 hospitalization began the limitations period for a claim for temporary total disablement, not for a permanent disablement that developed later. The Workers' Compensation Act (Act) draws a distinction between temporary total disablement and other types of disablement that leads to this conclusion.

Schwing cites *Gorman v. Atlantic Gulf & Pacific Co.*, 178 Md. 71, 12 A.2d 525 (1940), for the proposition that temporary total disablement and permanent disablement are events of "disability" that form the basis of a claim, even if both disabilities stem from the same occupational disease. The Court in *Gorman* analyzed the change that had been made to the Workmen's Compensation Law in 1920, which altered the compensability scheme for both temporary total and permanent partial disability. The Court stated:

> A temporary total disability and a permanent total disability, a temporary partial disability and a permanent partial disability, are four different compensable results; and the measure of the compensation to be appropriately awarded in these instances as they may occur is not for the court to create nor to change.
>
> . . .
>
> Instead of continuing the limitation on the amount of compensation for the specific injuries scheduled, the General Assembly provided that, where there was a temporary total disability, the compensation for a permanent partial disability from specified injuries should be in addition to the compensation allowed for the temporary total disability and be consecutively paid.
>
> . . .
>
> So, there may be *distinct, consecutive, and cumulative awards* of compensation for the periods of temporary total

disability and of permanent partial disability, under the Maryland Act, and other similar statutes.

*Id.* at 75–78, 12 A.2d 525 (emphasis added). Perhaps most telling, however, is the following passage:

It may be added that this period of temporary total disability is the healing period, or the time during which the workman is wholly disabled and unable by reason of his injury to work. *It is, therefore, a separate and unitary period of compensation,* and as such is distinguished from a permanent partial disability.

*Id.* at 78, 12 A.2d 525 (emphasis added). *Accord Baltimore v. Oros,* 301 Md. 460, 466–468, 483 A.2d 748 (1984). "This 'healing period' is distinguished from a permanent disability, partial or total." *Jackson v. Bethlehem–Fairfield Shipyard, Inc.,* 185 Md. 335, 339, 44 A.2d 811 (1945). The Court has noted: " 'The period of temporary total incapacity should not include any part of the period wherein the incapacity has become permanent.' " *Id.* at 340, 44 A.2d 811 (quoted source omitted).

The quoted reasoning of the Court of Appeals is supported by the current language of the Act. Section 9–631, in the Part dealing with permanent partial disabilities, states:

Compensation for a permanent partial disability under this Part IV of this subtitle shall be paid in addition to and consecutively with compensation for a temporary total disability under Part III of this subtitle.

Section 9–639, which deals with permanent total disabilities, states:

Compensation for a permanent total disability under this Part V of this subtitle shall be paid in addition to and consecutively with compensation for a temporary total disability under Part III of this subtitle.

No corresponding provisions of the Act establish a similar preference for temporary partial disability compensation or for permanent partial or permanent total disability compensation. The legislature, then, has gone to great lengths to designate temporary total disability, in particular, as separate-

ly compensable from the other three types of disability. As the *Gorman* Court stated, the period of temporary total disability is the "healing period," and is different in kind than a permanent disability that may hinder or completely incapacitate a worker for the rest of his or her life. Seen in this light, to deny a claim for permanent disability because a worker failed to comply with the limitations period for filing a claim for a temporary total disability would result in a manifest injustice, and would run contrary to the structure of the statute.

Several cases, interpreting the five-year limitations provision in L.E. § 9–736(b)(3) on modification of previous disability awards, have held that section applicable even in cases when the previous compensation payment was made for a different type of disability than was the subject of the modification, as long as the same occupational disease caused both kinds of disabilities. *See, e.g., Waskiewicz*, 342 Md. at 708–09, 679 A.2d 1094 (payment for permanent partial disability renders subsequent application for permanent total disability subject to L.E. § 9–736(b)(3)); *Stevens v. Rite–Aid Corp.*, 340 Md. 555, 561, 667 A.2d 642 (1995) (lapse of six years since claimant received payments "of either temporary total or permanent partial disability benefits" renders claim for additional permanent compensation benefits barred under L.E. § 9–736); *Vest*, 329 Md. at 476, 620 A.2d 340 ("[A]ll modifications to prior awards, regardless of whether these awards are temporary or permanent, must be sought within five years of the last payment of compensation under the initial award."). The failure of *Vest, Waskiewicz*, and other cases to distinguish different types of disabilities under a L.E. § 9–736 analysis may arguably support the proposition that the legislature intended that there be no distinction between temporary total disability and permanent disability when analyzing *any* of the provisions of the Act, including L.E. § 9–502.

There are several reasons, however, why these cases do not justify ignoring the language in *Gorman* and the structure of the Act, and why they do not deter us from drawing a distinction between total temporary disability and permanent

disability when discussing L.E. § 9–502. First, the above cases turned on the particular language of L.E. § 9–736(b)(3), which states that the Commission "may not modify *an award* unless the modification is applied for within 5 years after the last compensation payment." In *Vest*, the Court rejected the City's argument that then-§ 40(c) of the Act [9] (now L.E. § 9–736(b)(3)) did not apply to a request to reopen an award of temporary total disability when the Commission made no findings as to the extent of any permanent partial disability. *Vest*, 329 Md. at 476, 620 A.2d 340. The Court stated that § 40(c), in barring a change in an award of compensation made after the limitations period has expired, contemplated, by its plain language, *any* award of compensation. *Id.* Thus, the Court in *Vest*, in assuming that L.E. § 9–736 applied to the case, relied upon the language of that section. It did not undertake a qualitative analysis of the two types of "disabilities" claimed by the City.

In *Waskiewicz*, the Court, interpreting L.E. § 9–502 and L.E. § 9–736, held that an employee who has already claimed benefits for a disability caused by an occupational disease cannot base a claim for new benefits upon additional exposures that cause a worsening of his or her condition, but not a new disability. *Waskiewicz*, 342 Md. at 700, 679 A.2d 1094. Again, the Court's analysis in part turned upon a prior payment of compensation to the claimant. In contrast, as the Commission and the circuit court noted, there has been no payment of compensation on a claim (we assume, *arguendo*, in view of the City's waiver of the issue) in the case *sub judice*. The applicability of the reasoning in *Waskiewicz*, *Vest*, and other cases analyzing the limitations period of L.E. § 9–736(b)(3) to Schwing's claim is thus substantially curtailed, as those cases were based principally upon prior compensation payments to the claimants.

---

**9.** Section 40 was recodified in 1991, without substantive change, as present L.E. § 9–736. Decisions analyzing the prior version of that provision are applicable to the current version. *Vest*, 329 Md. at 463 n. 1, 620 A.2d 340.

In other words, the General Assembly decided to link the compensability of subsequent aggravation of disabilities to actual payments made under a previous award for the last stage of disability. *See* L.E. § 9–736(b)(3). This provides something of a solid basis for holding that an aggravated disability is compensable, as a new disability, when no prior award has been made for the disability prior to aggravation. After all, if the legislature had wanted to subject all aggravation claims to the time limitation of L.E. § 9–736(b)(3), regardless of whether any compensation was paid on a previous stage of the disability, then it could have enacted a section of the Act that would subject all aggravations of disabilities to a time limit within which to file for compensation, regardless of whether compensation had been paid on the original event of disablement.

We recognize, however, that, unlike *Vest*, *Waskiewicz* did not rely exclusively on the language of L.E. § 9–736(b)(3) when it denied the claim at issue in that case. The City in *Waskiewicz*, recognizing "that he could not prevail under the plain meaning of the reopening statute [§ 9–736] as well as our case law," *id.* at 711, 679 A.2d 1094, argued that additional exposures to a workplace hazard, which aggravated his permanent partial disability of fifteen percent to a permanent total disability, was analogous to a new accidental injury, rather than an aggravation of an existing disability. *Id.* In rejecting this argument, the Court of Appeals resorted to a qualitative analysis of the claimed "disabilities" in a way not attempted in previous cases, and expounded on the nature of a disability compensable under L.E. § 9–502(c): [10]

[Appellee] argues correctly that under § 9–502(a) an event of disablement resulting from an occupational disease

---

**10.** Section 9–502(c) reads, in pertinent part:

(c) *Liability of employer and insurer.*—Subject to subsection (d) of this section and except as otherwise provided, an employer and insurer to whom this subsection applies shall provide compensation in accordance with this title to:

(1) a covered employee of the employer for disability of the covered employee resulting from an occupational disease; . . . .

is the *only* event entitling a claimant to compensation. Compensation is awarded under § 9–502(c) on the basis of the singular event of disablement: "... an employer ... shall provide compensation in accordance with this title to ... a covered employee of the employer for *disability* of the covered employee...."

The language [appellant] cites is merely a part of the definition of "disablement." "Disablement," by the plain meaning of the language, is defined as a singular "event" of becoming partially or totally incapacitated because of an occupational disease, not as a series of exposures to the hazards of the same disease. Included within the definition of "disablement" is phrasing indicating exactly *what* the employee is "partially or totally incapacitated ... from ....": not simply the performance of any work whatsoever, but specifically from performing "the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease."

. . .

Allowing new claims for each exposure after the date of disablement would render subsection (c) meaningless, because one could never pinpoint the compensable event of "disability." Moreover, a careful reading of subsection (b) demonstrates that an injurious exposure only has relevance in identifying the liable employer on the date of the disablement: the "last" injurious exposure is the last exposure contributing to the *onset* of a disability, not its exacerbation.... An injurious exposure is not, and cannot by definition be, in itself a trigger for compensation, or a liable employer could never be ascertained and subsection (b) would also be meaningless.

[Appellant's] theory of exposure to the hazards of an occupational disease as a compensable event in itself, if put into practice, would lead to untenable outcomes. For example, if his theory prevailed, one might successfully argue that each day of work following the first claim of disability

contributed, however slightly, to a worsening of the disability, thereby entitling the claimant to a new claim each day. *Id.* at 706–08, 679 A.2d 1094. The Court then went on to state that the General Assembly never intended to allow new claims to be filed for additional exposures to a hazard once disablement has occurred, "or they would not have enacted the reopen provision found in § 9–736 of the Act to address the aggravation of existing disabilities." *Id.* at 708, 679 A.2d 1094.

We note first that the *Waskiewicz* Court limited its holding—that an employee may not base a new claim for benefits *under § 9–502* for a worsened disability—to those situations in which the employee has already claimed benefits for the previous stage of the disability. *Id.* at 700, 679 A.2d 1094. Furthermore, the two "disabilities" at issue in *Waskiewicz* were a permanent partial disability and a subsequent permanent total disability. *Id.* at 704, 679 A.2d 1094 ("[Appellant's] increase in disability due to carpal tunnel syndrome from 15% loss of use of both hands to 100% loss of use is non-compensable under the current statutory scheme."). In the case *sub judice,* the claimant suffered from a previous temporary total disability, and has submitted a claim for either a permanent partial or a temporary total disability, to be determined on remand. The difference is crucial. Essentially, the special nature of temporary total disability as a "separate" kind of disability, recognized in *Gorman* and subsequent cases as a separately compensable "healing period" and specifically noted in L.E. §§ 9–631 and 9–639 as separately compensable, was never part of the equation in *Waskiewicz.* No distinction that we have seen exists in case law or the statute between partial permanent disability and total permanent disability.[11]

---

11. In a dissent in *Waskiewicz* joined by Judges Eldridge and Bell, Judge Chasanow criticized the majority's opinion as ignoring the fundamental difference between an initial disability and a subsequent disability caused by subsequent exposure to workplace hazards:

Of course, the reason [appellant] could not apply for an increase in his compensation within five years of the 1976 award was because the second injurious exposure that caused his increased disability *did not even occur* until 1992, more than 15 years later. *In essence, the*

An examination of the policies underlying L.E. § 9–736 further underscores the logic of drawing a qualitative distinction between temporary total disability and permanent disability or a second temporary total disability, for use in those cases when no award of compensation was made or denied for the first temporary total disability. As stated in *Vest v. Giant Food Stores, Inc.*, 91 Md.App. 570, 585, 605 A.2d 627 (1992):

> The most serious administrative problem lies in the necessity of preserving the full case records of all claimants that have ever received any kind of award, against the possibility of a future reopening. Moreover, any attempt to reopen a case based on an injury ten or fifteen years old must necessarily encounter awkward problems of proof, because of the long delay and the difficulty of determining the relationship between some ancient injury and a present aggravated disability. Another argument is that insurance carriers would never know what kind of future liabilities they might incur, and would have difficulty in computing appropriate reserves.

*Id.* at 585, 605 A.2d 627 (quoting 3 LARSON, WORKMEN'S COMPENSATION LAW § 81.10 (1989) (citations omitted)). These comments relate strictly to the reasons for enacting L.E. § 9–736(b)(3), and the first and the last lose persuasive power when applied to a situation in which no claim for compensation was adjudicated to a resolution, as in the case *sub judice.* The need to keep the full records of any claimants who have

---

*majority holds that the statute of limitations on [appellant's] claim for total disability expired ten years before the total disability had even occurred.*

*Waskiewicz,* 342 Md. at 717, 679 A.2d 1094 (Chasanow, J., dissenting) (first emphasis in original, second emphasis added). Thus, although Judge Chasanow placed emphasis on the subsequent *exposure* to the workplace hazard, equally important to his dissent was his objection to a claim for total disability being barred long before that particular disability *even existed.* Judge Chasanow failed to convince the majority with this argument. Because the increase in *Waskiewicz* was from a partial permanent disability to a total permanent disability, however, the special status of temporary total disability—and the persuasive reasons for treating that type of disability as separately compensable—were not before the Court.

received awards against the possibility of a future reopening does not arise when no award was ever made or denied. Similarly, that insurance carriers need to know what future liabilities they might incur, so that they may compute appropriate reserves, is relevant only after an initial claim is made and the insurance company incurs an *initial* liability.

As for the second enumerated concern—that awkward problems of proof are presented by long delay and the difficulty of determining the relationship between some ancient injury and a present aggravated disability—the General Assembly has specified that the earliest date the limitations period of L.E. § 9–711 begins to run is the date of *disablement*, rather than the date of injurious exposure to the workplace hazard. *See* L.E. § 9–711(a); *Helinski*, 108 Md.App. at 473, 672 A.2d 155 ("A prerequisite to filing remains . . . in that a disablement, a *sine qua non*, must exist."). In the occupational disease context, such a rule reduces the inherent uncertainty surrounding such cases, as the Court of Appeals noted in *Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 475 A.2d 1168 (1984):

> Occupational disease cases typically show a long history of exposure without actual disability, culminating in the enforced cessation of work on a definite date. In the search for an identifiable instant in time which can perform such necessary functions as to start claim periods running, establish claimant's right to benefits, determine which year's statute applies, and fix the employer and insurer liable for compensation, the date of disability has been found the most satisfactory. Legally, it is the moment at which the right to benefits accrues; as to limitations, it is the moment at which in most instances the claimant ought to know he has a compensable claim; and, as to successive insurers, it has the one cardinal merit of being definite, while such other possible dates as that of the actual contraction of the disease are usually not susceptible to positive demonstration.

*Id.* at 39–40, 475 A.2d 1168 (quoting 4 Larson, *Workmen's Compensation Law*, § 95.21 (1981)). One possible implication of *Waskiewicz* is that a total permanent disability that began as a partial permanent disability is not a *new* compensable

disability, but merely an aggravation of an existing disability, at least when compensation has been paid for the first manifestation of the disability. *See Waskiewicz*, 342 Md. at 714, 679 A.2d 1094. Yet, as we have demonstrated, the General Assembly and the Court of Appeals have provided ample evidence that a temporary total disability should be treated as a disability separate and distinct from a permanent disability. This conclusion remains unaffected by *Vest*, which relied upon the fact of prior compensation, not the separable nature of the disability, to bar a claim for permanent disability after last collecting on a temporary total disability more than five years earlier.

Thus, the concern about an ancient injury that results in a recent aggravation of a disability may be valid when applied to a claim for an aggravation of an already existing disability, the situation covered by L.E. § 9–736 (and the situation addressed by the enumerated concern). The concern seems decidedly *inappropriate*, however, to a situation like the one presented in this case, when an occupational disease has caused a separate, compensable permanent disability. In most cases, we believe—and indeed, in this case—a period of temporary total disability, or "healing period," will not be followed by a period of full ability, then *permanent* disability or another period of temporary total disability, without some intervening cause: the occupational disease itself. Problems of stale proof, though perhaps not eliminated in all cases, are of less immediate concern than they are when already existing disabilities, caused by accidents that occurred long ago, are aggravated.

## CONCLUSION

By virtue of *Vest*, if a payment had been made on the TTD suffered in 1982, L.E. § 9–736(b)(3) would bar Claim B. Nothing in *Waskiewicz*, *Vest*, or any other case we have examined suggests, however, that the enactment of L.E. § 9–736 evinces an intent on the part of the General Assembly to bar a claim based upon a permanent partial or temporary total disability, when no award was made or compensation pay-

ments made on a previous claim for a temporary total disability suffered as a result of the same occupational disease as the second claim. Because L.E. § 9–711, by its very terms, is inapplicable, and because of the separable nature of temporary total disability explained by *Gorman* and provided for in the Act itself, we hold that Claim B is not barred by any limitations period set forth in the Act. On remand, the Commission should process Claim B.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED WITH INSTRUCTIONS TO REMAND TO THE WORKERS' COMPENSATION COMMISSION FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID ONE–HALF BY APPELLANT/CROSS–APPELLEE THE MAYOR AND CITY COUNCIL OF BALTIMORE AND ONE–HALF BY APPELLEE/CROSS–APPELLANT SCHWING.**

THEODORE G. BLOOM, Judge, Specially Assigned, dissenting.

It is frequently said that hard cases make bad law. This case may well be classified as a hard case because of the prospect that a firefighter who suffered a permanently disabling occupational disease might be precluded form obtaining workers' compensation benefits to which he should be entitled. What I believe to be errors committed by the circuit court and an erroneous interpretation by this Court of the Workers' Compensation Act may have resulted from a natural desire to avoid a harsh result. But believing that avoidance of a harsh result does not justify a misconstruction of the law, I respectfully dissent.

Because the facts and the procedural background of this case are unusual and involve several sections of the Worker's Compensation Act, a recitation of the applicable statutory provisions and a summary of the proceedings below may be helpful to an understanding of this case.

## Applicable Provisions of the Workers' Compensation Act

Maryland's Workers' Compensation Act is now codified as Title 9 of the Labor and Employment Article (L.E.) Of Md.Code (1991 Repl.Vol.). The following sections of Title 9 are applicable to this case:

- L.E. § 9–101(g) defines "Occupational Disease" as a disease contracted by a covered employee:

 (1) as the result of and in the course of employment; and

 (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated.

- L.E. § 9–502(a) defines "disablement" as the event of a covered employee becoming partially or totally incapacitated.

- L.E. § 9–503(a) provides that a firefighter who is a covered employee is presumed to have an occupational disease that was suffered in the line of duty and is compensable under Title 9 if

 (1) the individual has heart disease, hypertension, or lung disease resulting in partial or total disability or death.

- L.E. § 9–711(a) provides that "[i]f a covered employee suffers a disablement or death as a result of an occupational disease, the covered employee or the dependents of a covered employee shall file a claim with the Commission within 2 years ... after the date:

 (1) of disablement or death; or

 (2) when the covered employee or dependents of the covered employee first had actual knowledge that the disablement was caused by the employment.

§ 9–711(b) provides that failure to file a claim under subsection (a), unless waived, bars a claim under Title 9.

- L.E. § 9–736 provides, in effect:

(a) that, in the case of aggravation, diminution, or termination of disability after the rate of compensation is set or compensation is terminated, the Commission, on application by any party in interest or on its own motion, may:

(1) readjust for future application the rate of compensation; or

(2) if appropriate, terminate the payments

(b) The Commission has continuing powers and jurisdiction over each claim and may modify any finding or order as it considers justified, but may not (except in certain circumstances not applicable to this case) modify an award unless the modification is applied for within 5 years after the last compensation payment.

### Factual and Procedural Background

In December 1982, Mr. Schwing, a Baltimore City firefighter, suffered a relatively mild heart attack (myocardial infarction), which was sufficiently disabling that he could not return to work for about two months. Later, in July 1983, he underwent cardiac catheterization, which required him to lose a few more days of work. In June 1983, Mr. Schwing filed with the Workers' Compensation Commission a claim for compensation benefits, asserting that he had suffered an occupational disease. The City sought to implead the Subsequent Injury Fund and the Commission passed an order that the case would not be scheduled for hearing until all parties filed a stipulation containing certain information. Nothing further was ever done in that case, No. A895606 (hereinafter the A Claim). Meanwhile, by virtue of a contract between the City and the claimant's union, Mr. Schwing received full pay for the entire period he was off work, and all of his medical bills were paid by insurance.

From the time Mr. Schwing returned to work in 1983 until he suffered another myocardial infarction in December 1993, he continued to perform his normal duties, without restriction. The second episode was much more severe than the first one. He required, and underwent, a quadruple by-pass. On 21 March 1994, Mr. Schwing filed with the Commission another claim, No. B 309534 (hereinafter the B Claim), seeking compensation for an occupational disease: "heart disease; cardiovascular disease." The Commission concluded that, since

myocardial infarction is a result of cardiovascular disease, the B Claim was not a new claim and the then current condition was merely a worsening of the same illness he had in 1982. Consequently, by order dated 27 July 1994, the Commission disallowed the B Claim as being barred by limitations.

The claimant appealed the Commission's decision disallowing his claim to the Circuit Court for Baltimore City, which, after a hearing on cross-motions for summary judgment, issued an order on 27 September 1996, stating, "[F]or reasons stated on the record in court on September 26, 1996...."

1. That, in accordance with this Order, the case is remanded to the Workers' Compensation Commission for further consideration; and

2. That, in accordance with this Order, the case is remanded to the Workers' Compensation Commission for further consideration; and

3. That on remand the Commission shall determine to what, if any, Workers' Compensation benefits Claimant is entitled by virtue of Appellant's Claim filed June 23, 1983, Claim No. A–895606; and

4. That Claim No. A–895606 is not time barred by Section 9–736 of the Workers' Compensation Law of Maryland.

In its oral opinion on the record, the court expressly stated that it agreed with the City's contention [and thus with the Commission's ruling] that the claim filed in March 1994 was barred by limitations, because it was not filed within two years of the initial disablement, which had occurred back in 1982. Nevertheless, the claimant had filed a timely claim within two years after that disablement [the A claim, filed in 1983].

Both parties appealed to this Court from that order. In December 1996, the circuit court filed a "Memorandum Opinion Addendum" in which it deviated from its previous opinion and order. Consistently with its earlier decision, the court again concluded that the claimant's occupational disease originally manifested itself in 1982; this time, however, the court opined, contrary to its earlier ruling, that Mr. Schwing was not disabled by the disease until he underwent by-pass sur-

gery in 1993. "That being the case," the court stated, "the claim filed on March 10, 1994 is not barred by the two-year statute of limitations set forth in § 9–711(a).... Mr. Schwing first suffered a 'disablement' or incapacity from his occupational disease in December, 1993, and filed his 1994 claim within the two-year period."

Having done, or attempted to do, a post-appeal about face, the circuit court equivocated. Referring to its original opinion, it stated:

[I]f it were to be decided that Mr. Schwing not only was diagnosed with an occupational disease in 1982 when he first had a heart attack but also was incapacitated, then he should be permitted to pursue his first claim as there was never any adjudication on it. In the alternative, in view of the fact that he was able to continue his employment for ten years and suffered no adverse change in wage earning, he did not become disabled or incapacitated because of the cardiovascular disease until the by-pass surgery in December, 1993. Therefore the second claim he filed in March, 1994, is not barred by the statute of limitations. For these reasons, albeit in the alternative, the decision of the Workers' Compensation Commission is REVERSED.

So ordered.

Apparently, the circuit court, uncertain of the legal significance, consequences, or effect of its original decision on the claimant's ability to obtain workers' compensation benefits, attempted to hedge its bet by conceding that there might be a *factual* dispute over whether the claimant was disabled or incapacitated in 1982–1983 and by ruling that he would be entitled to compensation under one of his two claims in either event.

I

In its brief, the City asserts, as the heading of its first argument, that the circuit court did not have jurisdiction to decide whether claim No. A–895606, filed on June 23, 1983, was barred by the limitations provision of L.E. § 9–736. The

majority agrees with that assertion but fails to address the implication of the argument supporting that assertion. From a purely academic standpoint, I agree with the majority opinion and with the circuit court that L.E. § 9–736 does not apply with respect to the A Claim because there has never been any award or order in that claim that would be subject to modification or to the five year limitation period for modification of awards. That issue, however, as the City contends, was not before the circuit court. Indeed, it was a non-issue that never should have been raised by the City. The Commission decision that was appealed to the circuit court involved only Claim B; it was a decision disallowing Claim B because it was barred by L.E. § 9–711, which provides that a claim for occupational disease must be filed by the employee within two years after the date of "disablement" and that a claim not filed within that time will be barred.

Generally, a circuit court, upon an appeal from the Workers' Compensation Commission, is jurisdictionally limited to a review of the issues raised and decided explicitly or implicitly, and to such relevant matters upon which there was evidence before the Commission. *Altman v. Safeway Stores,* 52 Md. App. 564, 566, 451 A.2d 156 (1982); *Trojan Boat Co. v. Bolton,* 11 Md.App. 665, 670, 276 A.2d 413 (1971).

> The reviewing court considers and passes only on matters covered by the issues raised and decided below or on relevant matters as to which there was evidence before the Commission.

*Pressman v. State Accident Fund,* 246 Md. 406, 415–16, 228 A.2d 443 (1967).

The only issue raised and explicitly decided by the Commission was that the B Claim was barred by the two year limitation on filing claims set forth in L.E. § 9–711. Implicitly decided by the Commission, of course, was that the claimant's occupational disease (coronary artery disease or heart disease, which is presumed, by virtue of L.E. § 9–503(a), to have been suffered in the line of duty and therefore to be compensable) resulted in "disablement" or incapacity in 1982. When the

court, in its oral opinion on 26 September 1996, agreed with that implicit determination as well as the Commission's explicit decision that the B Claim was barred by limitations, the only proper decision that it could make, within its jurisdiction, was to affirm the Commission's decision. It had no jurisdiction to rule on or decide the viability *vel non* of the A Claim. Its ruling that the A Claim was not time barred by L.E. § 9–736 was beyond its jurisdiction, and it certainly had no authority to order or direct the Commission to determine what benefits the claimant was entitled to under the A Claim.

Another anomaly in the circuit court's original decision was its order vacating the Commission's order in part and sustaining it in part. It is difficult to comprehend how a simple order disallowing a claim can be dissected so that part of it can be sustained and another part vacated.

## II

The City also asserts that the circuit court did not have jurisdiction to issue its Memorandum Opinion Addendum on 17 December 1996. That assertion is, of course, absolutely correct and we ought to say so. The December 1996 opinion and order attempted to change the circuit court's judgment after both parties had appealed that judgment to this Court. The September judgment, in effect, said that the claimant's coronary artery disease did disable or incapacitate him in 1982 and, therefore, the B Claim, filed twelve years later, was barred by the § 9–711 two-year period of limitations. Where the court went wrong was in attempting to adjudicate the viability of the A Claim, which had never been decided by the Commission and was not before the court. The December 1996 decision of the court was an attempt to reverse its previous order by concluding that there was no disablement in 1982–1983 and, therefore, the 1994 claim was timely filed within two years after the illness became disabling in 1993. It is, of course, axiomatic that a trial court cannot alter its judgment after an appeal from that judgment has been taken. "[T]he law is well settled that ordinarily, the trial court's jurisdiction is ended upon the filing of an appeal to this

Court." *Stacy v. Burke,* 259 Md. 390, 401, 269 A.2d 837 (1970). An appeal does not divest the trial court of all jurisdiction over the case, but it does divest the court of jurisdiction over the judgment appealed from and any matter embraced therein. As the Court of Appeals explained in *Bullock v. Director of Patuxent Institution,* 231 Md. 629, 633, 190 A.2d 789 (1963):

> An appeal to this Court from a *nisi prius* court does not necessarily stay all further proceedings in the trial court, nor does it strip said court of all power over the proceeding in which the appeal has been taken. The trial court may act with reference to matters not relating to the subject matter of, or affecting, the proceeding; make such orders and decrees as may be necessary for the protection and preservation of the subject matter of the appeal; and it may do anything that may be necessary for the presentation of the case in this Court, or in furtherance of the appeal. But, when an appeal is taken, it does affect the operation or execution of the order, judgment or decree from which the appeal is taken, and any matters embraced therein. After the appeal has been perfected, this Court is vested with the exclusive power and jurisdiction over the subject matter of the proceedings, and the authority and control of the lower court with reference thereto are suspended. (Footnotes omitted.)

*See* supporting authorities set out in note 3 thereof. *See also, Irvin v. State,* 276 Md. 168, 170, 344 A.2d 418 (1975); *State v. McCray,* 267 Md. 111, 145, 297 A.2d 265 (1972); and *State v. Jacobs,* 242 Md. 538, 540–41, 219 A.2d 836 (1966), all quoting the above language from *Bullock.*

A more interesting feature of the December 1996 opinion is the uncertainty that occurs in the last paragraph, in which the court said that, if it were to be decided that its earlier decision was right and the claimant was disabled in 1982 when he had his first heart attack, then he should be allowed to pursue his A Claim, but if, in the alternative, it is decided that "disablement" did not occur until 1993, the B Claim is still viable. There are two major problems with that equivocation: (1) if

the court recognizes the possibility of doubt as to when the claimant was first disabled by his heart disease, the case should not have been decided by summary judgment; and (2) the Commission had already decided, implicitly, that Mr. Schwing was disabled or incapacitated by his heart disease in 1982–1983, otherwise it could not have ruled that the B Claim was barred by limitations. Fortunately, that perceived possibility presents no problem in this case. The undisputed facts admit of but one conclusion: as a matter of law, Mr. Schwing was disabled, temporarily, from performing his work as a fireman during a two-month period in 1982–1983.

### III

I fully agree with one conclusion reached by the circuit court, which with the majority opinion concurs: neither L.E. § 9–736 or *Waskiewicz v. General Motors Corp.*, 342 Md. 699, 679 A.2d 1094 (1996), is applicable to this case. L.E. § 9–736 deprives the Commission of authority to exercise its power to reopen or modify a previous order or decision if the application to reopen or for modification is not filed within five years after the last compensation payment. That provision is inapplicable to Claim A because there has never been an order or decision to modify. *Waskiewicz* held that a claimant cannot avoid the five year limitation provision by filing a new claim, for worsening of a condition for which compensation had been paid, on the theory that he had been subjected to additional injurious exposures. In this case, there had been no prior award that could have been modified and L.E. § 9–736 did not apply. As noted above, § 9–736 has nothing to do with this case and should never have been injected into it to befog the issues.

Where I disagree with the majority opinion is in its conclusion that L.E. § 711 does not apply if, after more than two years have elapsed since the employee was temporarily disabled by an occupational disease, he becomes permanently disabled by reason of a worsening of the disease. I disagree with the conclusion that a compensable permanent disability arising out of the same occupational disease that earlier

caused a temporary disability can be treated as if it were a different disease or as if the temporary disability had not already given rise to a compensable claim. Those conclusions, and the reasoning behind them, are, I believe, utterly inconsistent with L.E. §§ 9–101(g) and 9–502 and with the logical basis for the § 9–711 two year limitation on filing claims to begin with disablement, as explained by the Court of Appeals in *Lowery v. McCormick Asbestos Co.*, 300 Md. 28, 39–40, 475 A.2d 1168 (1984), quoted by the majority on page 32 of its slip opinion.

As pointed out in *Lowery,* occupational diseases usually involve "a long history of exposure without disability, culminating in the forced cessation of work on a definite date." The date of disability "is the moment at which the right to benefits accrues; as to limitations, it is the moment at which in most instances the claimant ought to know he has a compensable claim; . . . ." Section 9–101(g) defines "Occupational Disease" as a disease contracted by a covered employee as a result of and in the course of employment that causes the employee to become *temporarily or permanently* incapacitated; § 9–502 defines "disablement" as the event of an employee becoming partially or totally incapacitated, because of an occupational disease, from performing the work of the employee in the last occupation in which the employee was injuriously exposed to the hazards of the occupational disease. Under L.E. § 9–503(a), the last occupation in which Mr. Schwing was injuriously exposed to heart disease is presumed to be that of a Baltimore City firefighter; on 2 December 1982, he became temporarily incapacitated from performing his work as a firefighter, and thus he suffered a "disablement" (§ 9–503(a)) from an occupational disease (§ 9–101(g)), which started the running of the two-year period of limitations for filing a claim (§ 9–711).

The majority opinion recognizes that Mr. Schwing's heart disease caused him to be temporarily incapacitated in 1982–1983 and that the same disease resulted in a more severe, presumably permanent, incapacity in 1993. Consequently, although the date of onset of the claimant's coronary artery

disease can probably not be determined, the date of temporary disability is known: 2 December 1982, when he suffered a heart attack or myocardial infarction. As of that date he knew or ought to have known that he had a compensable claim; on that date began the two-year period of limitations within which his claim for compensation had to be filed or it would be lost.

The worsening over a period of time of an occupational disease from a temporarily disabling condition to a permanently disabling condition, even if the employee continues to be subject to injurious exposures, does not create a new compensable disease, beginning a new period of limitations; it is merely the aggravation of the same disease. *Waskiewicz*, 342 Md. at 704–13, 679 A.2d 1094. That proposition is as applicable to Mr. Schwing as it was to Mr. Waskiewicz, even though no award was ever made in this case.

I believe that, in view of the errors committed below, the only proper course of action by this Court would have been to reverse the judgment of the circuit court and remand the case to that court for the passage of an order affirming the Workers' Compensation Commission. It is not for this Court or for the circuit court to instruct the Commission as to the law governing the A Claim, and it was certainly not within the jurisdiction of the circuit court to direct the Commission to act upon the A Claim.